## NATIONAL LABOR RELATIONS BOARD v. MACKAY RADIO & TELEGRAPH CO.

No. 706. Argued April 5, 6, 1938.—Decided May 16, 1938.

---

[27] Cf. *Purity Extract Co.* v. *Lynch*, 226 U. S. 192.

*Mr. Charles Fahy,* with whom *Solicitor General Jackson,* and *Messrs. Robert L. Stern, Robert B. Watts,* and *Laurence A. Knapp* were on the brief, for petitioner.

*Mr. Louis W. Myers,* with whom *Messrs. Howard L. Kern, Homer I. Mitchell, H. W. O'Melveny,* and *Walter K. Tuller* were on the brief, for respondent.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

The Circuit Court of Appeals refused [1] to decree enforcement of an order of the National Labor Relations Board. [2] We granted certiorari because of an asserted conflict of decision. [3]

The respondent, a California corporation, is engaged in the transmission and receipt of telegraph, radio, cable, and other messages between points in California and points in other States and foreign countries. It maintains an office in San Francisco for the transaction of its business wherein it employs upwards of sixty supervisors, operators and clerks, many of whom are members of Local No. 3 of the American Radio Telegraphists Association, a national labor organization; the membership of the local comprising "point-to-point" or land operators employed by respondent at San Francisco. Affiliated with the national organization also were locals whose members are exclusively marine operators who work upon ocean-going vessels. The respondent, at its San Francisco office, dealt with committees of Local No. 3; and its parent company, whose headquarters were in New York, dealt with representatives of the national organization. Demand was made by the latter for the execution of agreements respecting terms and conditions of employment

---

[1] 87 F. 2d 611; 92 F. 2d 761.

[2] 1 N. L. R. B. 201.

[3] See *Jeffery-DeWitt Insulator Co.* v. *National Labor Relations Board,* 91 F. 2d 134; *National Labor Relations Board* v. *Bell Oil & Gas Co.,* 91 F. 2d 509; *National Labor Relations Board* v. *Carlisle Lumber Co.,* 94 F. 2d 138; *Black Diamond S. S. Corp.* v. *National Labor Relations Board,* 94 F. 2d 875.

of marine and point-to-point operators. On several occasions when representatives of the union conferred with officers of the respondent and its parent company the latter requested postponement of discussion of the proposed agreements and the union acceded to the requests. In September 1935 the union pressed for immediate execution of agreements and took the position that no contract would be concluded by the one class of operators unless an agreement were simultaneously made with the other. Local No. 3 sent a representative to New York to be in touch with the negotiations and he kept its officers advised as to what there occurred. The local adopted a resolution to the effect that if satisfactory terms were not obtained by September 23 a strike of the San Francisco point-to-point operators should be called. The national officers determined on a general strike in view of the unsatisfactory state of the negotiations. This fact was communicated to Local No. 3 by its representative in New York and the local officers called out the employes of the San Francisco office. At midnight Friday, October 4, 1935, all the men there employed went on strike. The respondent, in order to maintain service, brought employes from its Los Angeles office and others from the New York and Chicago offices of the parent company to fill the strikers' places.

Although none of the San Francisco strikers returned to work Saturday, Sunday, or Monday, the strike proved unsuccessful in other parts of the country and, by Monday evening, October 7th, a number of the men became convinced that it would fail and that they had better return to work before their places were filled with new employes. One of them telephoned the respondent's traffic supervisor Monday evening to inquire whether the men might return. He was told that the respondent would take them back and it was arranged that the official should meet the employes at a downtown hotel and make a statement to

them. Before leaving the company's office for this purpose, the supervisor consulted with his superior, who told him that the men might return to work in their former positions but that, as the company had promised eleven men brought to San Francisco they might remain if they so desired, the supervisor would have to handle the return of the striking employes in such fashion as not to displace any of the new men who desired to continue in San Francisco. A little later the supervisor met two of the striking employes and gave them a list of all the strikers, together with their addresses, and the telephone numbers of those who had telephones, and it was arranged that these two employes should telephone the strikers to come to a meeting at the Hotel Bellevue in the early hours of Tuesday, October 8th. In furnishing this list the supervisor stated that the men could return to work in a body but he checked off the names of eleven strikers who he said would have to file applications for reinstatement, which applications would be subject to the approval of an executive of the company in New York. Because of this statement the two employes, in notifying the strikers of the proposed meeting, with the knowledge of the supervisor, omitted to communicate with the eleven men whose names had been checked off. Thirty-six men attended the meeting. Some of the eleven in question heard of it and attended. The supervisor appeared at the meeting and reiterated his statement that the men could go back to work at once, but read from a list the names of the eleven who would be required to file applications for reinstatement to be passed upon in New York. Those present at the meeting voted on the question of immediately returning to work, and the proposition was carried. Most of the men left the meeting and went to the respondent's office Tuesday morning, October 8th, where on that day they resumed their usual duties. Then or shortly thereafter, six of the eleven in question took their places and resumed

their work without challenge. It turned out that only five of the new men brought to San Francisco desired to stay.

Five strikers who were prominent in the activities of the union and in connection with the strike, whose names appeared upon the list of eleven, reported at the office at various times between Tuesday and Thursday. Each of them was told that he would have to fill out an application for employment; that the roll of employes was complete, and that his application would be considered in connection with any vacancy that might thereafter occur. These men not having been reinstated in the course of three weeks, the secretary of Local No. 3 presented a charge to the National Labor Relations Board that the respondent had violated § 8 (1) and (3) of the National Labor Relations Act.[4] Thereupon the Board filed a complaint charging that the respondent had discharged, and was refusing to employ, the five men who had not been reinstated to their positions, for the reason that they had joined and assisted the labor organization known as Local No. 3 and had engaged in concerted activities with other employes of the respondent, for the purpose of collective bargaining and other mutual aid and protection; that by such discharge respondent had interfered with, restrained, and coerced the employes in the exercise of their rights guaranteed by § 7 [5] of the National Labor Relations Act and so had been guilty of an unfair labor practice within the meaning of § 8 (1) of the Act. The complaint further alleged that the discharge of these men was a discrimination in respect of their hire and tenure of employment and a discouragement of membership in Local No. 3, and thus an unfair labor practice within the meaning of § 8 (3) of the Act.

---

[4] U. S. C. Supp. II, Tit. 29, § 158 (1) and (3).

[5] U. S. C. Supp. II, Tit. 29, § 157.

The respondent filed an answer denying the allegations of the complaint, and moved to dismiss the proceeding on the ground that the Act is unconstitutional. The motion was taken under advisement by the Board's examiner and the case proceeded to hearing. After the completion of its testimony, the Board filed an amended complaint to comport with the evidence, in which it charged that the respondent had refused to re-employ the five operators for the reason that they had joined and assisted the labor organization known as Local No. 3 and engaged with other employes in concerted activities for the purpose of collective bargaining and other mutual aid and protection; that the refusal to re-employ them restrained and coerced the employes in the exercise of rights guaranteed by § 7 and so constituted an unfair labor practice within § 8 (1) of the Act. The amended complaint further asserted that the refusal to re-employ the men discriminated in regard to their hire and tenure of employment and discouraged membership in Local No. 3 and thus amounted to an unfair labor practice under § 8 (3) of the Act. The respondent entered a general denial to the amended complaint and presented its evidence. At the conclusion of the testimony, the Board transferred the cause for further hearing before the members of the Board at Washington, and after oral argument and the filing of a brief, made its findings of fact.

The subsidiary or evidentiary facts were found in great detail and, upon the footing of them, the Board reached conclusions of fact to the effect that Local No. 3 is a labor organization within the meaning of the Act; that "by refusing to reinstate to employment" the five men in question, "thereby discharging said employes," the respondent by "each of said discharges," discriminated in regard to tenure of employment and thereby discouraged membership in the labor organization known as Local No. 3, and, by the described acts "has interfered with restrained

and coerced its employes in the exercise of the rights guaranteed by Section 7 of the National Labor Relations Act." As conclusions of law the Board found that the respondent had engaged in unfair labor practices affecting commerce within the meaning of § 8, subsections (1) and (3), and § 2, subsections (6) and (7) [6] of the Act. It entered an order that respondent cease and desist from discharging, or threatening to discharge, any of its employes for the reason that they had joined or assisted Local No. 3 or otherwise engaged in union activities; from interfering with, restraining or coercing its employes in the exercise of the rights guaranteed by § 7 of the Act; offer the five men immediate and full reinstatement to their former positions, without prejudice to rights and privileges previously enjoyed, and make each of them whole for any loss of wages due to their discharge; post notices that the respondent would not discharge or discriminate against members of, or those desiring to become members of, the union, and keep the notices posted for thirty days.

As permitted by the Act, the Board filed in the Circuit Court of Appeals a transcript of the record of its proceeding, and a petition for enforcement of its order. In its answer the respondent denied the jurisdiction of the court on the ground that the Act violated Article III, and the Fifth, Seventh, and Tenth Amendments, of the Constitution; that the order amounted to an abuse of discretion because arbitrary and capricious, and was not supported by the evidence; that the trial examiner erred in his rulings on evidence; that the Board erred in overruling exceptions to his rulings, and that the Board's findings of fact and conclusions of law were erroneous.

Upon the hearing before the Circuit Court of Appeals, one judge held that the action of the Board was within

[6] U. S. C. Supp. II, Tit. 29, § 152 (6) (7).

the power sought to be conferred upon it by the statute, but that the grant of power violated the due process clause of the Fifth Amendment, and the award of back pay to the employes, without a jury trial, violated the Seventh Amendment. Another judge held that as the statute defined employes to include a person whose work had ceased "as a consequence of, or in connection with, any current labor dispute," and since there was no allegation, evidence, or finding as to such a dispute, the strikers had ceased to be employes within the meaning of the Act and the respondent's treatment of them could not violate the Act. One judge dissented, holding that the Board's order was within its statutory authority and did not violate the Constitution. A petition and supplemental petition for rehearing were granted and, after argument, the court reaffirmed its former decision. The judge who had previously declared the Board's action within the terms of the statute, but unconstitutional, construed the Act as not intended to work the unconstitutional result of compelling an employer to enter into a contract of employment against his will and, hence, as requiring only that the strikers be reinstated to the position of applicants for employment rather than employes. The other judges adhered to the views they had previously expressed.

The petitioner contends the court erred in holding that men who struck because of a failure of negotiations concerning wages and terms of employment ceased to be employes within the meaning of the statute; erred in not holding it an unfair labor practice, forbidden by the statute, for an employer to discriminate because of union activities in the reinstatement of men who have gone on strike because of a failure of negotiations concerning wages and terms of employment; erred in failing to hold that the Act authorizes the Board to order reinstatement of persons thus discriminated against; and one of the

judges erred in holding that the Act, if construed to authorize the Board to require such reinstatement, violates the Fifth Amendment.

On the other hand, the respondent insists that it was not accorded due process of law, because the unfair labor practice charged in the original complaint was abandoned and the action of the Board was based upon a conclusion of fact not within the issues presented; that there is no basis for the Board's order, because there is no finding that the strikers ceased work as a consequence of, or in connection with, any labor dispute, as defined in the statute; that the Act does not empower the Board to compel an employer to re-employ or reinstate those who have abandoned negotiations and gone on strike prior to any unfair labor practice, where the employer, after the strike is effective, and before committing any unfair labor practice, has permanently employed others in place of the strikers; that, if the Act be held to authorize the Board's order, it violates the Fifth Amendment; that Article III of the Constitution requires that the court render its independent judgment upon the quasi-jurisdictional facts upon which the Board's order was based; that the Board's order was, in the light of the facts, so arbitrary and capricious as to warrant the court's refusal to enforce it; and that the case is not properly before us because certiorari was not sought within the time fixed by law.

We hold that we have jurisdiction; that the Board's order is within its competence and does not contravene any provision of the Constitution.

*First.* Within the thirty days prescribed by the rules of the Circuit Court of Appeals the petitioner moved for a rehearing and for leave, if deemed appropriate, to take further evidence and add the same to the record before the Board. While this application was pending a supplemental petition for rehearing was presented. During the term the court entertained both petitions and granted a re-

hearing and, after oral argument and submission of briefs, wrote further opinions based upon the petitions for rehearing. We think the court had not lost jurisdiction of the cause; that its final judgment was the order entered upon the petitions for rehearing; and that the three months within which the petitioner must apply for certiorari ran from the date of the order dismissing the petition for rehearing and confirming the original order.

*Second.* Under the findings the strike was a consequence of, or in connection with, a current labor dispute as defined in § 2 (9) of the Act. That there were pending negotiations for the execution of a contract touching wages and terms and conditions of employment of point-to-point operators cannot be denied. But it is said the record fails to disclose what caused these negotiations to fail or to show that the respondent was in any wise in fault in failing to comply with the union's demands; and, therefore, for all that appears, the strike was not called by reason of fault of the respondent. The argument confuses a current labor dispute with an unfair labor practice defined in § 8 of the Act. True there is no evidence that respondent had been guilty of any unfair labor practice prior to the strike, but within the intent of the Act there was an existing labor dispute in connection with which the strike was called. The finding is that the strike was deemed "advisable in view of the unsatisfactory state of the negotiations" in New York. It was unnecessary for the Board to find what was in fact the state of the negotiations in New York when the strike was called, or in so many words that a labor dispute as defined by the Act existed. The wisdom or unwisdom of the men, their justification or lack of it, in attributing to respondent an unreasonable or arbitrary attitude in connection with the negotiations, cannot determine whether, when they struck, they did so as a consequence of or in connection with a current labor dispute.

*Third.* The strikers remained employes under § 2 (3) of the Act which provides: "The term 'employee' shall include ... any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment; ..." Within this definition the strikers remained employes for the purpose of the Act and were protected against the unfair labor practices denounced by it.

*Fourth.* It is contended that the Board lacked jurisdiction because respondent was at no time guilty of any unfair labor practice. Section 8 of the Act denominates as such practice action by an employer to interfere with, restrain, or coerce employes in the exercise of their rights to organize, to form, join or assist labor organizations, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, or "by discrimination in regard to . . . tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: . . ." There is no evidence and no finding that the respondent was guilty of any unfair labor practice in connection with the negotiations in New York. On the contrary, it affirmatively appears that the respondent was negotiating with the authorized representatives of the union. Nor was it an unfair labor practice to replace the striking employes with others in an effort to carry on the business. Although § 13 provides, "Nothing in this Act shall be construed so as to interfere with or impede or diminish in any way the right to strike," it does not follow that an employer, guilty of no act denounced by the statute, has lost the right to protect and continue his business by supplying places left vacant by strikers. And he is not bound to discharge those hired to fill the places of strikers, upon the election of the latter to resume their employ-

ment, in order to create places for them.[7] The assurance by respondent to those who accepted employment during the strike that if they so desired their places might be permanent was not an unfair labor practice nor was it such to reinstate only so many of the strikers as there were vacant places to be filled. But the claim put forward is that the unfair labor practice indulged by the respondent was discrimination in reinstating striking employes by keeping out certain of them for the sole reason that they had been active in the union. As we have said, the strikers retained, under the Act, the status of employes. Any such discrimination in putting them back to work is, therefore, prohibited by § 8.

*Fifth.* The Board's findings as to discrimination are supported by evidence. We shall not attempt a discussion of the conflicting claims as to the proper conclusions to be drawn from the testimony. There was evidence, which the Board credited, that several of the five men in question were told that their union activities made them undesirable to their employer; and that some of them did not return to work with the great body of the men at 6 o'clock on Tuesday morning because they understood they would not be allowed to go to work until the superior officials had passed upon their applications. When they did apply at times between Tuesday morning and Thursday they were each told that the quota was full and that their applications could not be granted in any event until a vacancy occurred. This was on the ground that five of the eleven new men remained at work in San Francisco. On the other hand, six of the eleven strikers listed for separate treatment who reported for work early Tuesday morning, or within the next day or so, were permitted to go back to work and were not compelled to await the approval of their applications. It appears that all of the

---

[7] Compare *National Labor Relations Board* v. *Bell Oil & Gas* Co., 91 F. 2d 509.

men who had been on strike signed applications for reemployment shortly after their resumption of work. The Board found, and we cannot say that its finding is unsupported, that, in taking back six of the eleven men and excluding five who were active union men, the respondent's officials discriminated against the latter on account of their union activities and that the excuse given that they did not apply until after the quota was full was an afterthought and not the true reason for the discrimination against them.

As we have said, the respondent was not bound to displace men hired to take the strikers' places in order to provide positions for them. It might have refused reinstatement on the ground of skill or ability, but the Board found that it did not do so. It might have resorted to any one of a number of methods of determining which of its striking employees would have to wait because five men had taken permanent positions during the strike, but it is found that the preparation and use of the list, and the action taken by respondent, were with the purpose to discriminate against those most active in the union. There is evidence to support these findings.

*Sixth.* The Board's order does not violate the Fifth Amendment. The respondent insists that the relation of employer and employe ceased at the inception of the strike. The plain meaning of the Act is that if men strike in connection with a current labor dispute their action is not to be construed as a renunciation of the employment relation and they remain employes for the remedial purposes specified in the Act. We have held that, in the exercise of the commerce power, Congress may impose upon contractual relationships reasonable regulations calculated to protect commerce against threatened industrial strife. *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 48. The Board's order there sustained required the reinstatement of discharged employes. The

requirement interfered with freedom of contract which the employer would have enjoyed except for the mandate of the statute. The provision of the Act continuing the relationship of employer and employe in the case of a strike as a consequence of, or in connection with, a current labor dispute is a regulation of the same sort and within the principle of our decision.

*Seventh.* The affirmative relief ordered by the Board was within its powers and its order was not arbitrary or capricious.

As we have held in *National Labor Relations Board* v. *Pennsylvania Greyhound Lines,* 303 U. S. 261, the relief which the statute empowers the Board to grant is to be adapted to the situation which calls for redress. On the basis of the findings, five men who took part in the strike were discriminated against in connection with a blanket offer to reinstate striking employes. The Board enjoined further discrimination against employes by reason of union affiliation, but it could not grant complete relief in respect of the five men short of ordering that the discrimination be neutralized by their being given their former positions and reimbursed for the loss due to their lack of employment consequent upon the respondent's discrimination. The order is criticized as arbitrary in that it is said to award back pay to date of reinstatement with deductions only for what was earned to the date of the order. We do not so read it, and the Board admits that credit must be given for all sums earned to date of reinstatement, and so construes the order. It is further said that the order arbitrarily and unreasonably requires the notices to be posted to state that respondent will not discharge its reinstated employes for any reason whatever. This clause of the order is inartificially drawn, and counsel for the Board admit that it should be read in connection with the remainder of the order forbidding discharge on the ground of union activity.

*Eighth.* The respondent was not denied a hearing with respect to the offense found by the Board. The respondent says that it was summoned to answer a complaint that it discriminated by discharging the five men and that, after all the evidence was in, this complaint was withdrawn and a new one presented asserting that its refusal to re-employ the five men was the head and front of its offending. Then it is said that when the Board came to make its finding it reverted to the position that what the respondent did had not been a failure to employ but a wrongful discharge. Thus the respondent claims that it is found guilty of an unfair labor practice which was not within the issues upon which the case was tried. The position is highly technical.. All parties to the proceeding knew from the outset that the thing complained of was discrimination against certain men by reason of their alleged union activities. If there was a current labor dispute the men were still employes by virtue of § 2 (3), and the refusal to let them work was a discharge. The respondent says that as the Board failed to find, in so many words, that there was a current labor dispute, its conclusion of fact that the men were discharged has no basis. But the Board found that the strike was called because the strikers were informed that the negotiations for a working agreement in New York were not proceeding satisfactorily. We think its action cannot be overturned for the mere reason that it failed to characterize the situation as a current labor dispute. The respondent further urges that, when the amended complaint was filed and the original one withdrawn, the charge it had to meet was a refusal to re-employ; that the phrase "re-employ" means "employ anew"; that if the Board had found a failure to employ the five men because of discrimination forbidden by the Act, the findings would have followed the complaint, whereas the Board, in its conclusions of fact, referred to respondent's action as "refusal to reinstate to

employment" and as a discharge; and the argument is that the findings do not follow the pleadings.

A review of the record shows that at no time during the hearings was there any misunderstanding as to what was the basis of the Board's complaint. The entire evidence, pro and con, was directed to the question whether, when the strike failed and the men desired to come back and were told that the strike would be forgotten and that they might come back in a body save for eleven men who were singled out for different treatment, six of whom, however, were treated like everyone else, the respondent did in fact discriminate against the remaining five because of union activity. While the respondent was entitled to know the basis of the complaint against it, and to explain its conduct, in an effort to meet that complaint, we find from the record that it understood the issue and was afforded full opportunity to justify the action of its officers as innocent rather than discriminatory.

At the conclusion of the testimony, and prior to oral argument before the examiner, the Board transferred the proceeding to Washington to be further heard before the Board. It denied respondent's motion to resubmit the cause to the trial examiner with directions to prepare and file an intermediate report. In the Circuit Court of Appeals the respondent assigned error to this ruling. It appears that oral argument was had and a brief was filed with the Board after which it made its findings of fact and conclusions of law. The respondent now asserts that the failure of the Board to follow its usual practice of the submission of a tentative report by the trial examiner and a hearing on exceptions to that report deprived the respondent of opportunity to call to the Board's attention the alleged fatal variance between the allegations of the complaint and the Board's findings. What we have said sufficiently indicates that the issues and contentions of

the parties were clearly defined and as no other detriment or disadvantage is claimed to have ensued from the Board's procedure the matter is not one calling for a reversal of the order. The Fifth Amendment guarantees no particular form of procedure; it protects substantial rights. Compare *Morgan* v. *United States,* 298 U. S. 468, 478. The contention that the respondent was denied a full and adequate hearing must be rejected.

*Ninth.* The other contentions of the respondent are overruled because foreclosed by earlier decisions of this court.

The judgment of the Circuit Court of Appeals is reversed and the cause is remanded to that court for further proceedings in conformity with this opinion.

*Reversed.*

MR. JUSTICE CARDOZO and MR. JUSTICE REED took no part in the consideration or decision of this case.