**FARMERS' COOPERATIVE EXCHANGE, Inc., v. TURNBOW et al.**

**SAME v. LEDERLE LABORATORIES, Inc., et al.**

**No. 9280.**

Circuit Court of Appeals, Ninth Circuit.

April 22, 1940.

Rehearing Denied June 11, 1940.

Lyon & Lyon, Frederick S. Lyon, Lewis E. Lyon, and Frederick W. Lyon, all of Los Angeles, Cal., for appellants.

Chas. E. Townsend and Roy C. Hackley, Jr., both of San Francisco, Cal. (Townsend & Hackley and Jack E. Hursh, all of San Francisco, Cal., of counsel), for appellees.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HANEY, Circuit Judge.

Decrees that claims of two patents were valid and infringed by appellant were entered in a suit brought by appellees, and resulted in this appeal.

The patents in issue are Lindstaedt patent No. 2,036,638 issued April 7, 1936 on an application filed June 15, 1929, and Turnbow patent No. 2,091,840 issued August 31, 1937 on an application filed September 30, 1930. Both relate to parasiticides for internal use in animals. While the patents are not restricted by their terms to parasiticides for internal use in chickens, practically the entire evidence is devoted to the use of such parasiticides in treating chickens.

About 1910 flocks of chickens were infested with roundworms which occupied the portion of the intestines which were alkaline. These worms fed on the nutriment taken by the chicken, which affected the egg-laying power of the chicken and its life. About 1915, it was discovered that nicotine, an alkaloid, was an effective agent for destruction of the roundworms. Since nicotine was also lethal to the chicken, the problem was to obtain a nicotine product which would destroy the worms without also destroying the life of the chicken. Various experiments were made with nicotine mixed with other substances, the nature of which need not be here discussed.

Without attempting to state technically the exact meaning of a colloid, it is sufficient here to say that a colloid is a substance which attaches to another material and which prevents the latter material from acting in the manner that it would in its

free state. It is generally believed that colloidal action takes place either by adsorption, or absorption, or both. Adsorption is described as the addition of a film of one substance over the surface of another, such as a film of oil over metal, and absorption is described as the filling of the pores of one material with another, such as the absorption of water by a sponge.

As illustrative of the use of such a principle, although the action is not indicated to be colloidal in the patent itself, one Dieterich filed an application for a patent on October 10, 1906, culminating in patent No. 896,807. The patent covered a product of cascara absorbed by agar-agar, which when "taken into the alimentary tract does not yield up its cascara to any substantial extent until it has passed into the large intestine * * *."

That the form assumed by the colloidal substance and the alkaloid remained although subjected to acid, but released the alkaloid when subjected to an alkaline substance was known as early as 1910. In a paper read by one Lloyd before the American Pharmaceutical Society, the subject was discussed. He then spoke of "a substance capable of holding an alkaloid intact in the presence of an acid, and of liberating it in the presence of an alkali" and called the substance a "colloid". He further stated that the "phenomenon" of alkaloidal reaction was "one of adsorption".

Lloyd's experiments were numerous. He used fuller's earth as the colloidal agent and such alkaloids as berberine sulphate, and "other alkaloidal salts, such as those of morphine, quinine, cocaine, etc.". A table gives other alkaloids used, but no mention of nicotine as such is made in the entire article except as it is contemplated by the word "alkaloid" or by the words "alkaloidal salts".

As a result of experiments Lloyd filed an application for patent on February 23, 1912 resulting in the issuance of patent No. 1,-048,712. Therein he announced that his discovery was "that alkaloids and alkaloidal salts will be thrown down from solution in water, alcohol and alcoholic and acidulated liquids when hydrated aluminum silicate (fuller's earth) is introduced into the solution and the mixture is agitated; and that alkaloids and alkaloidal substances will fail to enter into solution in the presence of insoluble hydrated aluminum silicate unless the alcoholic solution be rendered alkaline in character * * *."

On July 6, 1915, Lloyd filed two applications for patents. Patent No. 1,300,747 was issued as a result of one application and is similar to the previous Lloyd patent (No. 1,048,712) but specifically mentions "nicotin" as an alkaloid. The patent issued on the other application filed on July 6, 1915 (No. 1,250,331) is more important because it discloses the exact theory upon which the patents in issue are based, as shown by the following quotations therefrom:

"I have discovered that certain insoluble clays or compounds of magnesium when mixed with certain alkaloids or alkaloidal salts, will adsorb them and prevent their going into solution in water or liquids which are acidulated even to a slight degree, but that in liquids which are alkaline even to a slight degree, such alkaloidal substances will go into solution.

"The contents of the stomach are usually slightly acid, whereas the intestines are slightly alkaline. Hence the alkaloidal compounds of my invention will pass through the stomach, without the alkaloids or alkaloidal salts being dissolved, and in the intestines the alkaloids or alkaloidal salts will be dissociated."

The patent further states that the phenomenon takes place when various alkaloids mentioned, including "nicotin" are used.

In 1923 a parasiticide was advocated by the University of California Extension Service, and was known as "University Capsules". It consisted of a mixture of 6.6 cubic centimeters (7.92 grams) of Black Leaf 40 with 16 grams of Lloyd's Alkaloidal Reagent, a refined fuller's earth, which mixture was then packed in gelatine capsules in sufficient quantities to weigh 350 to 400 milligrams when filled. Manual administration of the capsules to each bird was required. In an article in a publication "Science" for June, 1923, Freeborn, of the California Agricultural Experiment Station, stated, concerning the capsules: " * * * The Lloyd's reagent holds the nicotine as long as the mixture is in an acid medium, liberating it when it becomes alkaline. The small intestine is slightly acid at its anterior end but becomes rapidly alkaline at about the point where the intestinal worms are present in the greatest numbers. Thus the nicotine is liberated at the desired point for the maximum effect on these worms * * *."

Thus it is clear that the principle of colloidal action was well known, and had in

730

fact been used in compounding a parasiticide in 1923.

The contents of the University Capsule when administered without the gelatine capsule, was lethal to chickens. That fact is probably accounted for by the reasoning that not enough colloidal material was used, in proportion to the quantity of nicotine used. Appellees' expert, Ramage, testified on cross-examination as follows:

"Q. These colloids differ greatly in their holding power for different substances, don't they? A. That is correct.

"Q. And it is a mere matter of selection by a chemist to select the one which would exert the greater holding power for any particular substance which he had under consideration? A. It is a matter of experimentation.

"Q. And selection? A. And selection, yes."

On June 15, 1929, Lindstaedt filed his application for patent. The specification states the object of the invention to be "the preparation of a parasiticide which may be administered internally, and which will effectively destroy or cause an expulsion of parasites such as round worms, without destroying the life of the animal". The specification states that while alkaloidal substances such as nicotine, coniine, or their salts will destroy parasites such as round worms, they will also destroy the life of the animal if administered alone, and that the composition of the invention is designed to overcome such difficulty. The specification states that the invention comprises, in terms of broad inclusion "a toxic substance such as an alkaloidal substance, in quantity sufficient to destroy internal parasites, and a substance which protects against the effect of a normally lethal dose of the toxic substance". The specification in "greater detail" states that the invention comprises "the product resulting from the combination of an alkaloidal substance such as coniine, nicotine, or their salts such as the sulphates or nitrates, and an organic substance of colloidal nature". The specification mentions the following organic substances "of colloidal nature": Hide-glue, casein powder, peanut meal, pea meal, soy bean meal, kamala powder, tragacanth powder, powdered Indian gum, powdered agar-agar, powdered shellac, all of the class of gums and resins, powdered starch and powdered soap.

A preferred form of the product is said to be "one gram pellets, containing 70 to 80 milligrams of any one of the described alkaloidal substances and about 900 to 1000 milligrams of any of the described substances of colloidal nature". The theory of operation of the compound or mixture in making the product is described as follows: "The product resulting from the combination of a colloid with the alkaloid is chiefly an adsorption and/or absorption product of the alkaloidal substance by the substance of colloidal nature. In this condition the toxic substance cannot pass through the semi-permeable lining of the stomach and into the system. In the claims the phrase 'colloidally held' is used to mean 'absorbed and/or adsorbed'."

The patent contains 12 claims of which 2, 3, 6, 8, 11 and 12 are in issue here.

Claim 8, of the claims in question, is one of the most specific. It is: "A non-lethal parasiticide for internal administration, for intestinal parasites, comprising the combination of a nicotine substance in a dose normally parasiticidal to said parasites and lethal to the subject being treated on ingesting the same alone, and an organic colloid, said organic colloid rendering said dose non-lethal to the subject being treated and leaving it parasiticidal to said parasites."

Claim 12 is more specific as to the elements of the compound. It claims a compound of nicotine (the alkaloid) and casein (the colloidal substance). The remainder of the claims in question are broader. Claim 2 covers a "toxic" substance and a colloidal substance. Claim 3 covers an "alkaloidal" substance and a colloidal substance. Claim 6 covers an alkaloid and an "organic colloid". Claim 11 cover a toxic substance and "casein". None of the claims specify any specific proportional amounts of alkaloid and colloidal substance to be used.

Turnbow filed his application for patent on September 30, 1930. The specification discloses that he was concerned with "flock" feeding to avoid individual manual dosages of the parasiticide. A specific application is said to consist of: the mixing of agar-agar with water and heating the mixture to a temperature sufficient to cause the agar-agar to go into colloidal solution, and after cooling to about 125° F., adding thereto Black Leaf 40, in a proportion of 10 pounds of the latter to 88 pounds of the agar solution. The patent contains 9

claims, of which 1, 2 and 7 are in issue, and all of which cover a product "in finely divided condition".

Of the claims in issue, Claim 2 is the most specific. It is: "A medicinal compound in finely divided condition comprising agar-agar and nicotine substance, said compound being non-toxic to fowls when given in quantities sufficient to destroy parasites of the intestinal tract."

Claim 1 covers a "toxic substance incorporated in agar-agar". Claim 7 covers a "toxic substance incorporated in a substance of colloidal nature". None of the claims in question specify any specific proportional amounts of toxic or alkaloidal substance and agar-agar or colloidal substance.

Appellant sold a product manufactured by one not a party to these proceedings. Appellees, as the owners in interest of the Lindstaedt patent, brought suit against appellant to restrain appellant from infringing upon such patent and to recover damages for past infringement. Appellant answered alleging that the Lindstaedt patent was invalid, and filed a cross-complaint alleging that appellees owned the Turnbow patent, and prayed that the same be declared void.

The trial court held the Lindstaedt patent to be valid and infringed, and found that Lindstaedt's "fundamental discovery and teaching * * * was that certain substances of colloidal nature, when mixed in sufficient quantities with a normally lethal dose of nicotine, would act to hold the nicotine against its lethal effect, while at the same time holding the nicotine in a form to permit release of the same at the habitat of the parasite, in the passage of the product through the intestinal tract of the animal being treated". Decree was entered accordingly.

The trial court further held the Turnbow patent valid and infringed, finding that Turnbow taught "the production of a non-lethal parasiticide in finely divided form". A separate decree on the counterclaim was entered accordingly. Appeal was taken from both decrees.

 We are of the opinion that all the claims in issue of both patents are invalid. As the prior art plainly shows, neither Lindstaedt nor Turnbow first conceived the principle of colloidal action. Neither of them first applied it to the treatment of round worms in chickens. The principle that an alkaloid, held by a colloidal substance, would be released in the alkaline portion of the intestine, had appeared both in the Lloyd patent No. 1,250,331, and in the University Capsule. The trial court's finding as to Lindstaedt's "fundamental" teaching, which is based on the testimony of an expert, is clearly and obviously erroneous despite the contention of appellees to the contrary. The expert's testimony could not change the physical facts, which were the publications of the Lloyd patent and the "Science" periodical. Likewise the mere fact that Lindstaedt and Turnbow mixed two substances together could not support a claim of invention.

What then, remains as novel in these patents? To decide that question it must be kept in mind as the testimony shows, that practically every substance in a particular condition will colloidally hold some other substance to some degree. By experiment and research it can be determined what substances will colloidally hold another. However, some colloidal substances have firmer action in that respect, than others. Since the problem was to release a normally lethal dose of alkaloidal substance in the alkaline portion of the intestines, it can be seen that the only discovery or novelty was the discovery of the amount of the colloidal material which it was necessary to use to prevent death of the subject to which it was administered. As can be seen, such amount might differ with the kinds of the colloidal material used. There are a great many alkaloidal substances, and Lindstaedt and Turnbow, could not, by the simple expedient of claiming a compound of alkaloidal substances and colloidal substances, obtain a monopoly of a countless number of compounds, which could be made from these immense classes of substances.

It is clear, therefore, that what, if anything, was novel, was the discovery of how much colloidal material was necessary to carry out the function of preventing the alkaloidal substance from having a lethal effect on the subject to which the product was administered. That the amount of colloidal material is vital, is shown by the lethal character of the contents of the University Capsule when administered without the gelatine capsule.

 It being apparent, therefore, that the novelty, if any, here, resides in the amount of the colloidal substance used, let us examine the claims. We may assume,

without so deciding, that the claims sufficiently describe the quantity of the alkaloidal substance. The quantity of colloidal substance is described only as being an amount sufficient to colloidally hold and protect against the lethal effect of the dose. Such is the exact function of the colloidal material. As said in General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 368, 58 S.Ct. 899, 901, 82 L.Ed. 1402: "* * * Recognizing that most inventions represent improvements on some existing article, process, or machine, and that a description of the invention must in large part set out what is old in order to facilitate the understanding of what is new, Congress requires of the applicant 'a distinct and specific statement of what he claims to be new, and to be his invention.' [35 U.S.C.A. § 33]. Patents, whether basic or for improvements, must comply accurately and precisely with the statutory requirement as to claims of invention or discovery. * * *"

The claims here violate that rule, and are void because "conveniently functional language at the exact point of novelty" is used. General Electric Co. v. Wabash Appliance Corp., supra, 304 U.S. 371, 58 S.Ct. 903, 82 L.Ed. 1402. See, also, Wood v. Underhill et al., 46 U.S. 1, 4, 5 How. 1, 4, 12 L.Ed. 23; The Incandescent Lamp Patent, 159 U.S. 465, 474, 16 S.Ct. 75, 40 L.Ed. 221.

In this connection, appellees in attempting to distinguish General Electric Co. v. Wabash Appliance Corp., supra, contend that "each and every of these claims specify the ingredients as well as the quantity or proportion of such ingredients". We are unable to agree with that contention. An entire class of ingredients is specified not specific "ingredients". The quantity or proportion of the class is not specified except "in conveniently functional language".

The instant case is one illustrative of the practice followed in many patents. The inventors experimented with and compounded particular alkaloidal substances with particular colloidal substances. Instead of confining their claims to that which they actually discovered, if anything, they attempted to monopolize all parasiticides which could be made from the entire class of alkaloidal substances with the entire class of colloidal substances. We think the patent law is not so benevolent, and although we do not base our decision on that express ground, we mention it to refute sug-

gestions that the issuance of a patent offers no protection to a patentee.

While the claims may be limited by the specification, the instant case falls within the rule stated in General Electric Co. v. Wabash Appliance Co., supra, 304 U.S. 374, 58 S.Ct. 904, 82 L.Ed. 1402, that the "claims in suit seek to monopolize the product however created, and may not be reworded, in an effort to establish their validity, to cover only the products of the process described in the specification, or its equivalent".

Reversed.