**MARATHON–CLARK COOPERATIVE DAIRY ASSOCIATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 13811.**

United States Court of Appeals Seventh Circuit.

March 27, 1963.

---

3. The dismissed juror was replaced by the first alternate chosen at the beginning of the trial.

Lloyd G. Andrews, Shawano, Wis., Charles F. Smith, Sr., Wausau, Wis., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Atty., Washington, D. C., Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, N. L .R. B., for respondent.

Before HASTINGS, Chief Judge, and DUFFY and SWYGERT, Circuit Judges.

HASTINGS, Chief Judge.

This matter is before us on petition of Marathon-Clark Cooperative Dairy Association (petitioner) to review a decision and order of the National Labor Relations Board (Board). In its answer, the Board petitioned for enforcement of its order.

The Board found that petitioner failed to bargain in good faith with union,[1] in violation of § 8(a) (5) and (1) of the National Labor Relations Act (Act), 29 U.S.C.A. § 158(a) (5) and (1). The Board further found that petitioner's failure to bargain in good faith was a causative factor in a strike among its employees and that petitioner's failure to offer reinstatement to the strikers upon their application therefor violated § 8(a) (3) and (1) of the Act, 29 U.S. C.A. § 158(a) (3) and (1).

In accord with the Board's opinion, petitioner was ordered, *inter alia*, to reinstate those employees who so desired and to terminate the arrangement resulting in contracting out its operations to the extent necessary to accommodate the employees desiring reinstatement. The Board's decision and order are reported at 137 NLRB No. 91.

Petitioner is a small cooperative located at Abbotsford, Wisconsin engaged in the manufacture and sale of cheese and other dairy products made from neighboring farmers' milk deliveries. At the time of the complaint, it had a total of six employees, a manager and a bookkeeper. The cooperative was financed by stock purchased by farm milk patrons. It had an unpaid board of seven directors, all milk patrons, of which non-salaried George A. Mathews was Chairman. No one received any pay other than the manager and the employees.

From 1950 to April 30, 1961, when its last collective bargaining contract expired, petitioner and union had maintained a collective bargaining relationship in which union represented petitioner's production and maintenance employees.

On February 23, 1961, under the contract then in force, union requested that the contract be reopened for negotiation. Negotiations started on March 24, 1961, after the parties had previously exchanged written demands in which union sought certain increases in benefits and petitioner sought what amounted to an across-the-board reduction in benefits. At the meeting, Mathews outlined in detail petitioner's financial plight and stated that changes, probably including contracting out the cheesemaking operations, were necessary. Discussion of the parties' demands proved fruitless.

Meetings were also held on April 21, May 12, June 5, June 9, July 18, August 21 and September 26, 1961. At all these meetings, petitioner's economic and operational problems were discussed. The possibility of contracting out was raised at all the meetings except the last three, which occurred during a subse-

---

[1] The union involved is General Chauffeurs, Teamsters, Warehousemen and Helpers Local Union No. 446, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

quent strike. Union progressively retreated from its original position until eventually it offered to settle for the old contract.

The trial examiner found "that from the very beginning the Union was offered the chance to take over the operation of the plant on a contract basis of a cent and a half a pound." There was not much discussion on the matter, however, because union was not interested.

On June 6, 1961, Raymond Yessa, union's business agent, met with the employees, and in accord with a strike vote which had been taken on May 1 a letter was sent on June 7, 1961 to each of petitioner's board members, saying the employees had decided "there will be a strike." On June 8, 1961, Yessa called board member Bergman and informed him the strike had been called for the following day. Bergman secured a one day delay in the strike to permit another meeting on the matter.

At this meeting of June 9, 1961, union made its offer to settle for the old contract. Six of petitioner's board members were present and were evenly divided on accepting union's offer. A further postponement of the strike was agreed on to permit the full board to consider the proposal.

On June 16, 1961, petitioner's board voted 4 to 3 to reject the offer of the old contract. Union was notified, and the strike and picketing began the next morning.

Late in April or May, while negotiations were in progress, Mathews began discussions with Melvin Nelson concerning Nelson's taking over petitioner's cheesemaking operation on a contract basis in the event of a strike. On June 1, 1961, Melvin Nelson moved to Abbotsford from his leased farm, 9 miles away. On June 10, Donald Nelson, Melvin's son who had been contacted by Melvin with regard to cheesemaking at petitioner's factory, resigned from his job at Fremont, Wisconsin and moved to Abbotsford, 90 miles away.

When the strike began, the Nelsons were called in to handle the cheesemaking. Initially they were employed on a salary basis, receiving less than the striking employees had been paid. After July 1, 1961, however, they undertook to operate the plant for a cent and a half per pound of cheese produced.

The Board, overruling its trial examiner, found that petitioner had failed to bargain in good faith. The Board's theory is that petitioner planned to rid itself of union by prolonging contract negotiations, thereby provoking a strike and replacing the strikers by contracting out the cheesemaking. We do no agree.

There is no substantial evidence on the record considered as a whole to support the Board's conclusion. To the contrary, the record reveals nothing more than an employer which adamantly refused to be moved from a bargaining position which it deemed to be in its best economic interest.

The record shows that petitioner's volume of production was steadily declining while the unit cost of production was constantly rising. The matter of contracting out the cheesemaking had been under consideration by petitioner for some time, and Mathews determined that this was the best way to put petitioner's operation on a sound financial basis. This was a bona fide and legitimate economic determination. See Jays Foods, Inc. v. N. L. R. B., 7 Cir., 292 F.2d 317 (1961).

Petitioner injected the issue of contracting out the cheesemaking at the first bargaining session and never withdrew from this position. Petitioner's offer of $1.15 an hour which came two and a half months after the strike began was a negative response to union's request for an offer. It was taken by union to mean that petitioner would not retreat from its position on contracting out the cheesemaking. From the beginning, petitioner offered union the opportunity to operate the plant on a contract basis of a cent and a half a pound, but union declined.

Knowing that union was not interested in making the cheese on a per pound basis and that if no concessions were made by petitioner union would probably strike, Mathews began to make plans to continue operations in such event. Contrary to its trial examiner, the Board found that petitioner's arrangements with the Nelsons were "firm" rather than precautionary because it found it incredible "[t]hat the Nelsons would give up their present means of livelihood and move closer to * * * [petitioner's] plant on the" mere possibility of a strike. This overlooks the fact that Donald Nelson was not even contacted by his father until after the strike vote of May 1, 1961 and Melvin Nelson did not move from his farm until a month after the strike vote. Furthermore, Melvin Nelson testified he drove a milk truck and he could "move to either one end [of his milk route] or the other."

These arrangements and subsequent comments made by Mathews about them that by prolonging the negotiations union would strike and Nelson would take over do not, under the circumstances of this case, indicate bad faith bargaining. By these statements, Mathews outlined to the board of directors the course petitioner should pursue in event of a strike.

The evidence relied on by the Board to show Mathews' antiunion animus is unconvincing. The trial examiner so found, and we agree. It consists of three isolated conversations which occurred two and a half years, one and a half years and six months before union served notice that it desired a new contract. Two of these conversations were social in nature, having occurred in taverns, and the third was characterized as not serious.

Assuming, *arguendo*, that Mathews harbored an antiunion animus and that his real motive was to eliminate the union, these factors would not be substantial evidence in this case of petitioner's refusal to bargain. The negotiations with union were the ultimate responsibility of a seven man board. A majority of the board was present at four of the five bargaining sessions which preceded the strike. In all, a majority was present at half of the meetings with union. At the others, petitioner was represented by a three man negotiating committee headed by Mathews.

On two occasions petitioner's officials requested postponement of the strike. Such a request was completely inconsistent with an intent on the part of Mathews or the board as a whole to provoke a strike. The vote on whether or not to accept union's offer of the old contract was four to three against acceptance. In short, the record shows that petitioner's entire board participated in the negotiations and was responsible for any action taken. Without the board's assent, Mathews could not implement his desires whatever they might have been. The Board makes no claim with respect to antiunion animus on the part of any of the other board members. The actions of petitioner were those of a seven man board, and evidence of bad faith bargaining on the part of one would not be sufficient to support such a charge against all.

On the record before us, we must agree with the conclusion of the trial examiner:

"If the record shows with 'remarkable clarity' a fixed intent on the part of * * * [petitioner] (or its president) when it entered negotiations that intent as I see it was purely economic and was to avoid entering into a contract with the Union except on the economic terms it or its president felt, rightly or wrongly, were necessary to avoid eventual economic collapse."

Having found that petitioner did not refuse to bargain in violation of § 8(a) (5) and (1) of the Act, it follows that the strike was economic and was not an unfair labor practice strike. It also follows that petitioner did not discriminate against the employees in violation of § 8(a) (3) and (1) of the Act when it failed to comply with their demand for reinstatement after effecting the arrangement with the Nelsons. National

Labor Relations Board v. Mackay Co., 304 U.S. 333, 345, 346, 58 S.Ct. 904, 82 L.Ed. 1381 (1938).

For the foregoing reasons, enforcement of the Board's order will be denied.

Enforcement Denied.