CLOW WATER SYSTEMS COMPANY, DIVISION OF McWANE, INC., Petitioner/Cross–Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.

Nos. 95–5656, 95–5799.

United States Court of Appeals, Sixth Circuit.

Argued May 21, 1996.

Decided Aug. 19, 1996.

442

Frank H. Stewart (argued and briefed), David H. Peck, Taft, Stettinius & Hollister, Cincinnati, OH, William F. Gardner (briefed), Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, AL, for Petitioner.

Aileen A. Armstrong, Deputy Assoc. Gen. Counsel, Linda Dreeben (briefed), Appellate Court Branch, Meredith L. Jason (argued and briefed), National Labor Relations Board, Washington, DC, for Respondent.

Before: RYAN and NORRIS, Circuit Judges; JOINER, District Judge.*

JOINER, District Judge.

Petitioner Clow Water Systems Company seeks review of an order of the National Labor Relations Board, finding that Clow committed an unfair labor practice by permanently replacing economic strikers after they had made an unconditional offer to return to work. The offer was made by a facsimile transmission, which was not seen by the intended recipient or anyone else at the company until after the replacement workers had been hired. Based upon the particular facts of this case, we grant Clow's petition for review, and deny the Board's cross-application for enforcement.

## I.

An employee whose work has ceased as a consequence of a labor dispute continues to enjoy "employee" status under § 2(3) of the National Labor Relations Act (NLRA), 29 U.S.C. § 152(3), if he has not obtained regular and substantially equivalent employment. Such employees are entitled to reinstatement upon their unconditional offer to return to work, and an employer's refusal to reinstate constitutes an unfair labor practice unless the refusal is supported by legitimate and substantial business justifications. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378–79, 88 S.Ct. 543, 545–46, 19 L.Ed.2d 614 (1967) (citing *NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1938)). A legitimate and substantial business justification will be found when the employer permanently replaces striking workers during the course of the strike in order to continue its operations, so long as the replacements are hired before the strikers offer to return to work. *Id.* at 377–79, 88 S.Ct. at 545–46.

This case requires us to decide the legal effect of an unconditional offer to return to work made by a facsimile transmission which was sent and physically received before permanent replacements were hired, but which was not noticed or seen until after permanent replacement workers were hired. We set

* The Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation.

forth the facts found by the administrative law judge (ALJ) and undisturbed by the NLRB on review.

The United Steelworkers of America (the union) is the bargaining representative of Clow's production and maintenance employees. The parties' most recent contract was scheduled to expire in February 1991, but was extended by agreement while the parties bargained over the terms of a new contract. Bob Andrews and Steve Smith served as spokesmen for the union and Clow, respectively, and had an understanding that negotiations would be conducted solely by them. Andrews and Smith did not have an agreement to communicate by one exclusive method, but their usual method was by telephone. Early in the negotiations, the men exchanged their home phone numbers, and called each other as needed on weekends and evenings.

The contract extension lapsed in June 1991, when the workers went out on strike. During the next six months, the plant was operated by salaried and office personnel at 25 percent capacity. In December, Clow announced its intent to hire permanent replacement workers, prompting a request by Andrews that Clow postpone this action to permit the workers to consider ending their strike. Smith asked Andrews to inform him of the result of the workers' vote, and Andrews did so, calling Smith at home after midnight to tell him that the workers voted to return to work. The following day, Andrews confirmed the information with a letter, which was delivered both personally and by certified mail.

The workers voted to resume the strike on February 11, and Andrews informed Smith that the strike was going to be "long and hard." Clow again found it necessary to use salaried and office personnel to operate the plant, and again decided to hire permanent replacement workers. Clow began hiring workers at out-of-town locations on February

15 and February 18, and scheduled additional interviews for Saturday, February 22.

On Friday, February 21, both Smith and his secretary worked away from their offices, performing production duties in the plant. Andrews placed a call for Smith at 11:40 a.m., and was told that Smith was working in the plant, but that the message would be given to him. Andrews called again at 12:30 p.m., and, when told that Smith was unavailable, asked for personnel manager Frank Eschleman. Andrews told Eschleman that he needed information about the replacements, including whether they were to be permanent or temporary. Eschleman answered that he believed that the replacements were permanent. Andrews told Eschleman that he wanted Smith to confirm this information directly. Both Eschleman and Smith testified that they believed Andrews needed the information for a meeting scheduled for the following Monday. Smith thus saw no urgency in returning Andrews' call, and planned to do so after conferring with counsel on Monday.

In testimony discredited by the ALJ, Andrews claimed to have told Eschleman during the 12:30 p.m. phone call that the union was considering returning to work.[1] The union made the actual decision to return to work at approximately 3:20 p.m. Andrews placed another call to Smith shortly thereafter, and again spoke to Eschleman. Eschleman told Andrews that he had given Smith the earlier message, and that Smith would return his call. This time, despite the fact that the union had decided to end the strike, Andrews did not claim to have so informed Eschleman.

Smith left his work station in the plant at 3:45 p.m., and prepared to leave for the day. He stopped by the mail room to pick up mail in his box, and left for home at 4:30 p.m., shortly before Clow's office closed at 5 p.m. Because Smith had not returned his calls, Andrews prepared a letter announcing the

1. Eschleman denied that Andrews made any mention of ending the strike. The ALJ credited Eschleman's testimony over Andrews' testimony for a number of reasons, including Andrews' uneasy demeanor when testifying; his inconsistent reports regarding when the actual decision to end the strike was made; and the fact that in his original testimony on direct he described only his need for information about replacement workers, and made no mention of telling Eschleman that the union was considering returning to work until Board counsel asked him a leading question. The ALJ also found it unlikely that Andrews would have informed Eschleman of the union's deliberations. The Board did not disturb the ALJ's factual finding.

union's unconditional offer to return to work, and transmitted a facsimile of the letter to Smith at 4:34 p.m. Clow's facsimile machine is in the sales department; facsimiles that do not relate to sales are placed in the intended recipient's mailbox and then delivered to the appropriate offices. When Smith stopped by his office and the mailroom on his way out of the building at 4:30 p.m., there was no facsimile at either location. The facsimile was received on Clow's machine at 4:35 p.m.

Andrews had sent Smith only four facsimile transmissions prior to the transmission at issue, all of which contained contract proposals. In most instances, Andrews called Smith and told him that a facsimile was being sent, and explained that "it's only common courtesy to notify the individual you're sending a fax prior to sending a fax." Andrews testified that he suspected on Friday afternoon that Smith was attempting to avoid him. Nonetheless, Andrews did not call Smith at home over the weekend to personally inform him of the union's offer to return to work. Nor did he send a certified letter as he had in January.

Meanwhile, the strikers continued to picket throughout Friday, Saturday, and part of Sunday. Unaware of the union's offer to return to work, Smith and Eschleman adhered to the previously set schedule for interviewing and hiring replacement workers on Saturday, February 22. They hired 27 permanent replacements that day, and instructed them to report on Monday morning.

The union held a meeting on Sunday, at which the workers were informed that the union had invoked its right to end the strike without a vote, and that they should report for work on Monday morning. Approximately 200 workers gathered at the plant gate on Monday morning, but Clow would not allow them to enter. Andrews called Smith and informed him of the facsimile transmission made on Friday. The transmission was then located in the sales department, and delivered to Smith.

The union filed an unfair labor practice charge against Clow, claiming that it wrongfully hired permanent replacement workers after the union had made an unconditional offer to return to work. Following a hearing, the ALJ found that Clow had no notice that the union was considering returning to work, and that Clow took no action to prevent the offer from being received. The ALJ further found that Andrews chose to communicate the offer to return to work in a manner entirely different from the methods previously employed by him, and failed to take any measures to insure that Smith promptly learned of the facsimile. The ALJ concluded that Smith's failure to learn of the facsimile transmission should be attributed to Andrews, and that the offer to return to work was not effectively communicated until Monday morning, after 27 permanent replacements had been hired. Accordingly, the ALJ recommended that the unfair labor practice complaint against Clow be dismissed. On review, the Board disturbed none of the ALJ's findings of fact, but reached the opposite conclusion with respect to whether the facsimile transmission constituted an effective communication as of the time that it was physically received at Clow's office on Friday afternoon. The Board interpreted the ALJ's decision as requiring actual knowledge of an offer to return to work, and held that actual knowledge is not required. The Board noted that the parties had communicated by facsimile during their negotiations, and that the facsimile was sent and received during regular office hours. In light of these facts, the Board found it reasonable to impute knowledge of the facsimile to Clow as of the time that it was physically received.

## II.

We must first determine the proper test with which to measure the effectiveness of the facsimile transmission at issue. The Board explicitly disavows a bright-line rule that would make effective any facsimile received during regular business hours, and, for its part, Clow does not advocate a hard and fast rule that the employer always must have actual knowledge of the union's offer to return to work. Both parties suggest a middle ground, with Clow contending that more should required of the union than was done here.

In resolving this preliminary issue, we are mindful that two important, and competing, rights are involved. The first is the right of striking employees to reinstatement upon making an unconditional offer to return to work, a right premised on the recognition that an employer's refusal to reinstate employees, even if unaccompanied by anti-union motivation, would discourage employees from exercising core rights under the NLRA. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378–79, 88 S.Ct. 543, 545–46, 19 L.Ed.2d 614 (1967). The second is the concomitant right of employers to protect and continue their businesses during the course of a strike, with permanent replacements if they so choose. *NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1938). The need to protect both these rights leads us to conclude, in conformance with Board precedent, that an unconditional offer to return to work, must be "made in such manner and under such circumstances as make it reasonable to infer that [the] offer was communicated to [the] employer." *SCA Serv. of Georgia, Inc.*, 275 NLRB 830, 852, 1985 WL 45523 (1985). This test for the legal effectiveness of an offer to return to work does not require actual knowledge on the part of the employer, and thus avoids the risk that employees' right to reinstatement can be defeated where the actions of the employer, whether intentional or negligent, prevented such knowledge. Nor, however, does the test sacrifice the employer's right to hire permanent replacements in favor of a bright-line rule which would deem all facsimiles effective if received during normal business hours. Such a rule, while enjoying ease of application, would allow a union to cut off an employer's right to hire replacements where there is no basis on which to conclude that the employer knew or reasonably should have known of the employees' offer to return to work. We thus believe that the Board's standard for assessing the legal effectiveness of an offer to return to work is correct, because it accommodates the competing interests at stake in this case.

We part company with the Board, however, in determining whether that standard was met on the record before us. We review the Board's application of law to particular facts under the substantial evidence standard, meaning that the Board's conclusion must be supported by " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 368 (6th Cir.1993) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). Upon review of the record as a whole, we conclude that substantial evidence does not support the Board's determination.

The test we adopt today requires us to examine the manner of communication and the circumstances under which it was made; thus, we must explore the parties' past practices and any agreements they might have had regarding the conduct of negotiations. The essential facts are these. First, with respect to the parties' past practices in communicating with each other, it is undisputed that their customary method was by telephone. The union had sent only four facsimile transmissions in the thirteen months during which the parties were conducting negotiations. All of these facsimiles contained contract proposals—a communication intended to be examined and considered, *not* a communication having legal import in and of itself. Moreover, Andrews admitted that his customary practice was to personally alert Smith that a facsimile was being sent. While Andrews may not have been able to so inform Smith on Friday, absolutely nothing prevented him from calling Smith at home over the weekend. Second, with respect to communicating a back-to-work decision, Smith had made it clear on the one occasion on which this issue arose in the past that he desired to be informed immediately. Because Smith knew that a vote was scheduled, he asked Andrews to call him with the result. On this occasion, Smith had no knowledge that the union was considering a return to work; indeed, until Monday morning, Smith was under the impression that a return could occur only with the approving vote of the striking employees. Thus, Smith had no reason to affirmatively ask Andrews to keep him informed. Smith's past request, however, put Andrews on no-

tice that Smith desired immediate, and *personal,* notice of such decisions.

Communication by facsimile has simplified and streamlined the way in which business is conducted in this country. This technological advance provides a valuable service and benefit, and our holding should not be taken as an indication that parties should not use facsimiles to conduct their affairs. Certain attributes of facsimiles warrant precautionary measures to ensure that the intended recipient actually receives the transmission, however. Unlike mail or courier deliveries, which generally arrive predictably at certain times during the work day, facsimiles can arrive, unsolicited and unnoticed, at any time, day or night. Companies frequently have internal mail deliveries timed to their receipt of mail or courier deliveries. Facsimiles may arrive minutes or hours after the last·internal mail delivery of the day. Unless the facsimile machine is under constant surveillance, a communication easily may be overlooked for the better part of a business day. Thus, while technology permits almost instantaneous transmission of information, the transmission may go unnoticed for hours.

In the end, however, the key to this case is not the fact that a facsimile transmission was used. The key to this case is, simply, fair notice. If the parties, expressly or by conduct, agree to a method of communication, and use the agreed-upon method, we will not require actual knowledge of the communication on the part of the recipient. If the parties did not agree to the method of communication utilized, and if there is no pattern of conduct reflecting acquiescence to the method of communication utilized, we will not impute notice of the communication to the recipient. This is the situation presented here. Andrews departed from the course of conduct he had established with Smith in several ways. His use of an unannounced facsimile, without additional communication by the methods regularly utilized by him in the past, does not allow us reasonably to infer that the offer to return to work was effectively communicated to Clow. Under the circumstances, therefore, the union's unconditional offer to return to work was not time-ly communicated prior to Clow's hiring of permanent replacements.

We thus **GRANT** Clow's petition for review, and **DENY** the Board's cross-application for enforcement.