**HAZEL–ATLAS GLASS CO. v. NATIONAL LABOR RELATIONS BOARD.**

No. 4862.

Circuit Court of Appeals, Fourth Circuit.

March 11, 1942.

Rehearing Denied April 16, 1942.

James M. Guiher, of Clarksburg, W. Va. (Oscar J. Andre and Steptoe & Johnson, all of Clarksburg, W. Va., on the brief), for petitioner.

Leonard Appel, Attorney, National Labor Relations Board, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Gerhard P. VanArkle, Asst. Gen. Counsel, David Findling, and Margaret M. Farmer, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

The charges of violation of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., brought against the employer in this unusual case grow out of the employer's encouragement of a labor organization affiliated with the American Federation of Labor to unionize its plant in order to forestall the efforts to that end of an affiliate of the Congress of Industrial Organization. Unlawful discrimination in the lay-off and reinstatement of employees is included among the charges.

Hazel-Atlas Glass Company, a West Virginia corporation, owns and operates glass and mining properties, a metal plant, and glass manufacturing plants in various states, including a glass container and tablewear manufacturing and decorating plant at Clarksburg, West Virginia. By far the largest part of the raw material used and by far the largest part of the finished products manufactured at this plant move in interstate commerce. In 1937 it employed about 1,800 workmen.

During the decade prior to 1937 efforts were made by the American Flint Glass Workers' Union of North America, an affiliate of the A. F. of L., called herein the "Flints", to organize the plant; but strong opposition was met from the employer and the efforts met with little success. In February and March, 1937, the Federation of Flat Glass Workers, an affiliate of the C. I. O. herein called the "Flats", began activities to organize some employees, and thereupon the employer invited the Glass Bottle Blowers Association of the United States and Canada, an affiliate of the A. F. of L., to come in and organize the plant as soon as possible. The result was that the plant was soon completely organized, and the Flints, who had renewed their efforts during the period, were conceded to have superior jurisdictional claims and were therefore chosen to represent the employees.

On April 28, 1937, the plant superintendent confirmed in writing the verbal understanding that the Flints were recognized as the sole bargaining representative of all the employees at the plant, and the Flint officials concluded that this recognition carried with it the closed shop and the check-off of union dues. The check-off was actually put into effect on or about May 23, 1937, and on July 21, 1937, the principle of the closed shop was recognized after a notice was received from the Flints that their members would not work unless all the workmen were compelled to join their organization.

In the meantime, on June 14, 1937, the Flats requested recognition on the ground that they represented a majority of the employees, but they were informed by the management that the plant had a closed shop agreement with the Flints; and thereafter the Flats were inactive and did not present

any claim of representation until April 6, 1940. Because of the closed shop agreement, Atkinson, the president of the C. I. O. Local, and another worker were discharged on July 22, 1937, and a third worker was discharged on August 9, 1937. Thereafter the weekly meetings and the solicitation of members by the Flats were abandoned; and only a few meetings of less than a dozen men were occasionally held at private homes.

On May 20, 1937, following the recognition of the Flints, representatives of the parties held a bargaining conference in Clarksburg, and ratified a contract previously entered into between the Flints and the National Association of Manufacturers of Pressed and Blown Glassware to govern the workers at the Clarksburg plant. This contract contains what is known as the Star Island Agreement, which provides for a detailed method of settling labor disputes without a strike or walkout. Some question subsequently arose as to whether it was agreed at this conference that seniority rules should govern all departments. The Board found that the parties did not agree to use seniority as the only basis for selecting employees for promotions, lay-offs, or other purposes, but merely that seniority should be recognized as an element to be considered with other factors.

The charges in this case grow out of the termination of employment of certain workmen during 1937 and 1938 and one workman in 1939. A pronounced decline in business at the Clarksburg plant became evident around the middle of 1937, and in September and October of that year, 36 men were laid off in the Hot Metal Department, familiarly known as the "hot end". None of the complainant employees were laid off at that time although they were junior to some of the men who were laid off and their union activities had been previously performed.

On January 19 and 22, 1938, 225 men were laid off in the "hot end", constituting about 50 per cent of the entire force in this department. The reason for the lay-off was that during the latter part of 1937 and the early part of 1938, production decreased substantially. Two hundred, who were laid off on January 19, 1938, belonged to what is known as the "boys" group, a name given to adults who perform comparatively unskilled manual labor. Only 181 of the "boys" were retained. Nelson, the department head, conferred with the foremen and supervisors at three meetings attended by 15 to 20 men in all, at which selections were made of the "boys" to be retained. With respect to these meetings the Board found:

"Shortly after New Year's Day in January 1938, Nelson called a meeting of the foremen in the production department and told them they would have to cut the force of boys down to 45 men for each of the 4 shifts. He gave each foreman a list of the men on their respective shifts, on the basis of which they were to select the men to be laid off and those to be retained. He said that efficiency and length of service were to be considered in making the selections: if employees apparently had the same efficiency, then their length of service was to govern, and if they had the same length of service, then their efficiency was to be the determining factor. Nelson retained copies of the lists used by the foremen on each of the four shifts, except that on his lists there had been noted by the personnel director, at Nelson's request, the hiring date and marital status of each employee.

"Some of the more obvious decisions regarding employees to be laid off or retained were made at this meeting, but the selections could not be completed. Nelson testified: 'It was very difficult and it is hard to lay men off. Each foreman was very reluctant.' So a second and then a third meeting were held in order that the foremen might make their determinations on the borderline cases. All foremen testified that it was a hard job to get down to the final 45 men. Foreman William Blackwell said: 'We came to the place where it was pretty hard to cut down the list, and we were getting all about the same kind of boys, that is, of the same equal.' Presumably it was in these cases of approximately equal ability that the respondent allowed seniority to determine the selection of employees to be retained and laid off."

There were no production records from which the efficiency of the individual men could be determined, and the decision had to be based upon the judgment and opinion of the foremen and supervisors with whom the men worked. Complainants Rogers, William Radcliffe, Reed, Gaines and Whytsell were among the 200 "boys" who were laid off on January 19, 1938.

On January 22, 1938, 13 out of 20 "Extra operators"[1] were laid off, including complainants McClung, Phares and Guy Rad-

---

[1] The expression "extra operators" is a misnomer. Such employees were not skilled operators and were not paid as such, but were paid approximately the

cliff, and on the same day, 9 out of 23 "up-keep" men or skilled floor machinists were laid off, including the complainant Casto. The selections were made in conferences between the head of the department and the foremen or supervisors personally familiar with their work, and the test enjoined upon the foremen was efficiency and ability, with due regard to the length of service.

After the January lay-offs, entries were made by the head of the department upon the personnel sheets of the men indicating the date of the lay-off and the reason the men were not retained. These entries were made from notes taken at the time, but were not completed until two or three months after the occurrence.

On January 25, 1938, a number of the men laid off appeared before the representatives of the employer and of the Union in order to lodge a complaint in accordance with the procedure prescribed in the Star Island Agreement. Those who appeared, including complainants Rogers and Gaines, did not complain that they had been discriminated against because of union activities, but their protests were based on such grounds as personal favoritism, failure to observe seniority, &c. On February 9, 1938, Rogers complained in writing to the President of the company that the foremen in many cases made unfair selections by bringing in relationship and friendship in choosing the men to be retained.

On or about March 15, 1938, 84 of the men laid off in January 1938 were rehired as "boys" in the production department in the "hot end". All of the men rehired were selected from those who had been laid off, and no new men were taken on. It is the contention of the employer that the selections were made by the foremen from the men best qualified for the work at hand.

On March 30, 1938, Rogers and other employees laid off in January 1938, waited upon Carnahan, a prominent official of the company at Wheeling, in order to lodge a complaint in regard to the retirements and reinstatements, but no complaint was made that the lay-off had been occasioned by union activities. Again on June 29, 1938, in a letter on the same subject to the plant superintendent, Rogers complained of discrimination on account of friendship and relationship, and of the failure to live up to the agreement of seniority of May 20, 1937. No mention was made in this writing of union discrimination.

On October 6, 1938, 58 employees, acting under the Star Island Agreement, filed written protests against their lay-off with the Annual Joint Conference of the Union and the National Association. A committee of 5, including complainants Rogers, W. Radcliffe, G. Radcliff and Reed, was appointed to prepare the protests. The protestants included the 5 men in the "boys" group and the 3 men in the "extra operators" group who are complainants in this case. The protests made no mention of union discrimination, but were based upon the alleged failure of the company to consider seniority rights.

The first charge before the Labor Board was filed by Rogers on April 25, 1938. It was subscribed and sworn to before the field examiner and was couched in formal language giving reference to the sections of the National Labor Relations Act alleged to have been violated. It contained the charges, amongst others, that the employment of 14 men, including the complainants Gaines, W. Radcliffe, Whytsell and Rogers, had been unlawfully terminated because of their sincere and active membership on behalf of the Flints, and that the employer had refused to reemploy them in violation of its agreement to abide by seniority rules. It is noteworthy that when the complainant preferred written complaints unassisted, no mention of discrimination of union activities was made.

The formal complaint issued by the Board against the employer was filed on or about February 17, 1940. In addition to unlawful interference with the employees in the selection of their bargaining representative, the complaint charged the termination of the employment of Rogers on January 19, 1938, and of G. Radcliff on January 22, 1938, and a refusal at all times thereafter to reinstate

---

same wages as "boys" from which class they were selected to act as helpers of the foremen, run errands for them, and relieve them of some of the details of their work. The class of "extra operators" came into existence when new machinery with which the operators were not familiar was introduced and additional supervision on the part of the foremen was required. The classification was discontinued shortly after the lay-off in 1938. The Board concluded that the "extra operators" required more skill than the "boys"; but evidence of substantial superiority is lacking, while payment of like wages indicates that "boys" and "extra operators" were of equal value to the company.

them because of their membership in and militant activities on behalf of the Flints. In addition it was charged that the employer terminated the employment of Thomas Berry on April 26, 1937, the employment of Whytsell, Gaines, Reed and Radcliff on January 19, 1938, and the employment of Phares, McClung and Casto on January 22, 1938, and the refusal at all times thereafter to reinstate these employees because of their membership in and activities on behalf of the Flats.

Berry was an experienced operator but was given "boys" work to do on April 12, 1937, on account of lack of business. The chairman of the "boys" branch of the union protested against Berry's employment as a "boy" and his employment was therefore terminated and he was not subsequently reinstated when an opportunity to do so occurred. The question to be hereinafter considered as to him is whether he was refused reinstatement on account of union activities on behalf of the Flats as found by the Board, or because, as contended by the company, he failed after his employment was terminated to report to his foreman from time to time in accordance with the rule of the plant.

During the course of the hearing another charge was added to the complaint by the insertion of a paragraph alleging the discriminatory discharge on December 12, 1939, of Harry E. Carder, a foreman, under circumstances to be hereinafter set out.

The hearings on the complaint issued by the Board began on April 15, 1940, and ended May 31, 1940. On April 17, 1940, a stipulation was filed by the employer, the Flints and the Flats, with the approval of the Board, that an election should be conducted under the supervision of the Board on June 11, 1940, to ascertain whether the employees desired to be represented by the Flints or the Flats, and that in the meantime, the contract between the company and the Flints should be suspended. It was further agreed that if either labor organization obtained a majority, the company would recognize it as an exclusive bargaining representative of the employees; and also that the stipulation should be a complete and final settlement of all charges of violation of the Labor Act alleged to have been committed by either the company or the Flints with respect to the contract between them, provided that the stipulation should not be used as a basis for objecting to any testimony otherwise competent and material to the issues remaining in the case, as to which the hearing should proceed forthwith.

At the election on June 11, 1940, under the supervision of the Board, the Flints received 830 and the Flats 480 votes. Thereafter the hearing proceeded as to the remaining charges.

The decision of the Board was rendered on August 18, 1941. Therein the Board, one member dissenting, ordered the employer to cease and desist from:

"(a) Discouraging membership in the American Flint Glass Workers Union of North America and Locals 5, 54 and 88 thereof and Branches 565, 566, 567, 568, 569, 570 and 580 thereof, and the Federation of Flat Glass Workers and Hazel-Atlas Local 48 thereof, or any other labor organization of its employees, by laying off, discharging, or refusing to reinstate any of its employees because of membership in, or activity in connection with any such labor organization, or by discriminating in any other manner in regard to their hire or tenure of employment or any term or condition of their employment;

"(b) In any other manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the Act."

The employer was also ordered to offer reinstatement to the "boys" Rogers, W. Radcliffe, Reed, Gaines and Whytsell, and to the "extra operators" McClung, Phares and G. Radcliff, and to the upkeep man Casto, and also to Berry and to foreman Carder; and to make each of them whole for any loss of pay he might have suffered by reason of the discrimination against him.

The dissenting member stated that no good purpose was served by ordering the respondent to cease and desist from discouraging membership in the Flints which had a valid closed shop contract, or from ordering the employer to cease discrimination against the Flats, when the contract required such discrimination; and that it was futile to pretend to reinstate members of the Flats in the face of the contract.

■■ The actions of the employer in encouraging membership in the Flints and discouraging membership in the Flats consti-

tuted violations of Section 8(1) and (2) of the Act; but these violations have little significance now by reason of the stipulation of April 17, 1940, approved by the Board, under which as a result of the election the validity of the bargaining contract between the company and the Flints was established. Nevertheless that portion of Section 1(a) of the Board's order which directs the employer to cease and desist from discouraging membership in the Flats may have some value in bringing home to the employees that their freedom of choice still remains— at least insofar as it is not restricted by the closed shop agreement. On the other hand, there is no foundation in the Board's findings of fact or conclusions of law for that part of Section 1(a) of the order which directs the employer to cease and desist from discouraging membership in the Flints. The employer has never been guilty of such misconduct, for its whole effort, as we have seen, was directly to the contrary. For these reasons that part of Section 1(a) of the order must be omitted, and as so modified, Section 1 of the order will be affirmed.

█ We think, also, that there was sufficient evidence to support that portion of Section 2 of the Board's order which directs the employer to offer reinstatement to Thomas Berry and make him whole for any loss of pay suffered by him by reason of the loss of his position. Berry was not a member of the group laid off in 1938. He last worked at the plant on April 12, 1937. He had had several years' experience as a "boy", "extra operator", floor machinist and operator. During the last few days of his employment he was working as a "boy" but was laid off on April 12 upon the protest of the Chairman of the "Boys" Branch of the Local Union of the A. F. of L. that Berry was primarily an operator. It then became Berry's duty under the rule of the plant to report daily to his foreman for work if he desired reinstatement; otherwise the employer would feel free, after the lapse of a month, to pull his card from the rack of employees and consider the employment at an end. Carder, who was Berry's foreman, testified that Berry did not conform to the rule. In the latter part of May the paymaster noticed that Berry's name had not been on the payroll for two consecutive pay days, and upon inquiry Carder stated that he understood that Berry had quit. Accordingly his card was pulled on May 24, 1937.

Berry joined the Flats on March 29, 1937, and became its open and active partisan in the solicitation of members during the contest between the rival unions that persisted throughout the month of April. He testified that he reported for work on several occasions after his lay-off, but was not allowed to go into the plant as the watchman had orders to keep him out; and that after his card was pulled, he was told by the plant superintendent and also by the production manager that this action was taken because they understood that he had secured a job as an organizer for the C. I. O. As a matter of fact he had not served as a paid organizer for the union. There was also evidence that in two instances a member of the C. I. O. had been cautioned by his foreman that his activities on behalf of the C. I. O. might lead, like Berry's, to a loss of his position. When it is considered that the lay-off occurred during the period of active controversy between the unions, it appears that the circumstances related constituted sufficient basis for the Board's action in Berry's case.

█ But when we come to consider that part of Section 2 of the Board's order which directs the employer to offer reinstatement to the five "boys" and four "extra operators" and compensate them for any loss of pay they may have suffered, we have great difficulty in finding a sufficient basis of fact to support the ruling. The issue drawn, as we have seen, is whether these men lost their positions because of union activities or because they were deemed by the employer to be of less value to the business than the workmen selected for retention when a decline in business necessitated a reduction of the force. The burden of proof was of course upon the complainants, and the case as to these men must fall if it appears that there was no substantial evidence of unlawful discrimination, and that the findings of the Board against the employer rests upon nothing more solid than speculation or conjecture.

█ There was no direct evidence that the complainants were discharged for union activities. All the direct evidence was to the contrary; and the Board reached its conclusions by rejecting the direct evidence as false and by drawing certain inferences from the evidence that remained. It is the sufficiency of the latter evidence that must now be considered, for it is obvious that the mere rejection of the employer's denials as

perjury does not take the place of affirmative evidence of wrong doing. At the outset we are confronted with certain striking, unusual and undisputed facts, common to all of the nine cases, which go very far to show a complete absence of the unlawful motive which the Board by inference attributes to the employer.

■ First of all it must be realized that the employer's original hostile attitude toward labor unions had been abandoned. It is true that the employer was a reluctant convert, and its eager invitation to the A. F. of L. to organize the plant was due to its abhorrence of the C. I. O.; but the transformation was nevertheless complete and no business could be more fully and finally unionized than its plant has been since the spring of 1937.

Not only was the unionization of the plant complete, but all fear of the intrusion of the C. I. O. had vanished when the lay-offs in January and the reinstatements in March 1938 took place. Every workman was then of necessity a member of the A. F. of L. A contract recognizing the closed shop and the check-off had been signed. The C. I. O. had retired from the field; only a handful of men had an occasional meeting in private houses unknown, so far as the evidence shows, to the employer. The C. I. O. in fact presented no further claim of recognition until April 6, 1940, seven weeks after the filing of the formal complaint of the Board stigmatizing the employer's activities on behalf of the A. F. of L. as unlawful; and in the election subsequently held on June 11, 1940, under the auspices of the Board the C. I. O. was hopelessly outvoted.

It is admitted that the retirements and reinstatements in 1938 were caused by changes in business conditions. It is also admitted that in January, 1938, when the first of these lay-offs took place and the unlawful discrimination is supposed to have been begun, the head of the department affected called his foremen together and instructed them to be governed by considerations of efficiency and seniority in selecting the 45 men to be retained out of each of the four shifts. Three meetings, attended by from 15 to 20 foremen, were held at which there was much discussion of the relative merits of the men; and the selections of the men to be laid off were made with difficulty and reluctance. If union membership or activity had been taken into consideration at these meetings, some evidence of its influence would have necessarily transpired; but it is safe to say that union activity was not discussed, for no mention of it was made in the testimony of Harry E. Carder, the witness upon whom the Board rests its entire case as to these complainants. Carder attended the meetings in the capacity of foreman; and he was then on good terms with the management, as his discharge did not take place until December 12, 1939, nearly three years later.

When the reinstatements were made in March, 1938, the head of the department again instructed the foremen to make their selections on the basis of efficiency and seniority.

The lay-offs under discussion took place in January, 1938, but previously in September and October, 1937, 36 men had been laid off by reason of a pronounced decline in business. Some of them were senior to the nine complainants, but none of the latter lost their positions although all of the union activities, held by the Board to be the cause of their subsequent discharge, had taken place in the spring of 1937. It would have been an easy matter for the employer to have seized this chance to get rid of them.

The Board charges in its complaint that Rogers and G. Radcliff were discharged because of their membership in and militant activities on behalf of the Flints. Rogers had cooperated vigorously with his employer in establishing this affiliate of the A. F. of L. in the plant; and G. Radcliff was President of the Flints Local No. 88, which included the "extra operators". Just why the management, which itself had gone to great lengths on behalf of the A. F. of L., should have been offended by the activities of these two men is not clear. Had there been any reason to suspect that their discharges were aimed at curbing too vigorous efforts on behalf of the union, as the Board suggests, the resentment of the union would have been inevitably aroused and it would have gone into action immediately. Nothing of this sort occurred; on the contrary, the national president of the Flints, who died shortly before the hearing, wrote to the Pittsburg office of the Board on June 13, 1938, that no men had been dismissed in the January lay-off because of their union activities and that the reduction of the force was in keeping with the conference agreement. It may be added that the most active officers of Branch 566 of the Flints, which included all of the "boys", were John Leonard, Cecil Johnson and Harry Summers, and they were never laid off. The seven remain-

ing complainants in these groups, i. e., W. Radcliffe, Reed, Gaines, Whytsell, McClung, Phares and Casto, were Flats; but none of them was a prominent figure in the organization. Of great significance is the fact that none of the nine men laid off suspected that hostility to either union had influenced the company's selections, for as we have seen, complaints filed by them with divers persons on January 25, 1938, February 9, 1938, March 30, 1938, June 29, 1938, and October 6, 1938, respectively, made no mention whatsoever of this subject but charged only favoritism or failure to observe seniority rights.

The Board endeavors to support its findings by pointing to activities of the 9 men during the conflict between the unions in the first part of 1937, and to efforts on the part of the management to dissuade the men from assisting the C. I. O. For example, there was evidence that W. Radcliffe, Reed, Gaines, Whytsell, McClung, Phares and Casto were active and outspoken on behalf of the Flats; that Phares engaged in a fight with an employee who broke a promise to join the Flats; that Gaines solicited between 200 and 300 men to join the organization, and that Reed's shirt was marked with the initials "C. I. O." in jocular recognition of his advocacy. There was evidence also that McClung was warned by his foreman on several occasions that C. I. O. activity on his part would lead to the loss of his job, and that the plant would close if the C. I. O. succeeded in organizing it; that Phares was warned by his foreman that he had better be careful or he would be fired; that Casto received similar warnings from his foreman and was told that the production manager had directed that every one caught with a C. I. O. card would be discharged, and that when he requested reinstatement, his foreman reminded him of these warnings; that Reed was warned by his foreman that the C. I. O. "boys" were going to lose their jobs; and that Whytsell's foreman declared that he was too much for the C. I. O. The testimony also indicated vigorous activity on the part of Rogers, first as an adherent of the Flints and later on behalf of the Flats, and that G. Radcliff was constantly involved in difficulties with the company's officials, and on one occasion cooperated in a short strike which was called without notice to the company.

From this evidence the conclusion is drawn that the 9 men were objectionable to the company and that it therefore seized the opportunity in 1938 to get rid of them. The Board rejects the testimony of numerous foremen familiar with the work of these men through immediate supervision to the effect that their services were not as satisfactory as those of the men who were retained; and accepts without qualification the testimony of Carder, who had much less opportunity for observation than the immediate foremen, to the effect that most of the 9 men were quite as efficient as men of less seniority who kept their jobs.

There was of course ample room for difference of opinion or mistake or favoritism or other circumstances, irrelevant to this inquiry, affecting the judgment of the foremen who made the selections. But the Board rejected all of these possibilities and condemned the testimony of the foremen as a concerted and perjured attempt to conceal unlawful discrimination on the part of their employer. One reason for this sweeping conclusion was the finding of the Board that certain of the foremen had given false testimony in other respects when they denied that they had endeavored to influence the men in 1937, during the course of the conflict between the rival unions. But as to each of the 9 men, like testimony of inefficiency was given by other foremen who did not participate in these denials and who were in no way discredited. For example, Rogers' relative inefficiency was vouched for by 4 such witnesses, Reed's by 2, Gaines' by 3, McClung's by 4, &c.

Another reason given by the Board for rejecting the testimony of all these men was that Carder, who expressed a more favorable opinion as to the efficiency of the complainants, was a disinterested witness. There was, however, no evidence to support the finding of impartiality on Carder's part. On the contrary, he was a complainant himself, charging that he had been deprived of his position because he had participated in a strike of certain employees in December, 1939, and it was manifestly to his interest to show that his employer had been guilty of other infractions of the National Labor Relations Act. But even if it be conceded that the preference of the Board for Carder's opinion of the men's efficiency must be accepted as within the province of the triers of fact, it does not follow that the Board's ultimate conclusions were justified; for there was still lacking affirmative proof that the loss of positions by the complainants was due to their union activity rather than to favoritism on the part of the foremen based

on friendship or relationship, as the complainants themselves repeatedly charged. In short, the circumstances in our opinion do not constitute substantial evidence of unlawful discrimination against the nine complainants in January and March, 1938. Undoubtedly there had been unlawful interference with the workmen in the exercise of the right to self organization in the early part of 1937 and to this illegality, the evidence, to which reference has just been made, was entirely pertinent. But the controversy between the unions was over when the lay-offs and reinstatements were made in the early part of the following year. The company had then completely realized its desire and it had no reason to select these men from all the rest for harsh and unjust treatment. In view of the business emergency that gave rise to the reduction of the number of employees, the instructions to the foremen to make their selections on the score of efficiency and seniority, the absence of any mention of union activities in the meetings of the foremen, or of any suspicion on the part of the men themselves of unfair labor practices, we think that the evidence furnishes basis for nothing more substantial than the merest suspicion that the company, despite the satisfactory ending of the conflict between the unions, was giving vent in 1938 to a resentment against the complainants that it had been nursing for a year.[2]

█ "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' Consolidated Edison Co. v. National Labor Relations Board, supra, [305 U.S. 197, page 229], 59 S.Ct. [206], 217 [83 L.Ed. 126], and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." National Labor Relations Board v. Columbian Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660.

The remaining employee included in Section 2 of the Board's order is Harry E. Carder whose complaint grows out of an occurrence on December 12, 1939, when 6 operators went on an "illegal" strike because they were directed to clean their machines as part of their duties. The strike was contrary to a provision of the Star Island Agreement that any disagreement between the management and the men should be settled at the factory, but if not, it should be submitted to a joint committee representing the company and the workers, and meanwhile, the work should go on. Since the strike was a violation of the agreement, the operators were quickly ordered back to work by the national officers of the union; and they returned on December 15, 1939. They were allowed to come back on the condition that they would keep their machines reasonably clean.

But the company refused to reinstate Carder. When the strike occurred, a very important order was in production and the superintendent asked Carder and two other foremen to help out and operate the machines so as to finish the job. The two other foremen agreed but Carder refused. He said that as the petitioner was having labor trouble, he could not work there. He also said that he had been promised when he was taken on years before that he would not have to operate a machine. The Board held that the company's refusal to reinstate him was occasioned by Carder's sympathy for and assistance rendered the strikers through his own refusal to work.

██ As he was a foreman, Carder was not a member of the union; but he was none the less entitled to the protection of the act if the termination of his employment was occasioned by unfair labor practice designed to interfere with the employees in the exercise of the rights guaranteed them by the terms of the statute, such as the right to

[2] The Board's treatment of Casto's case has a peculiarity all of its own. Casto was one of the 9 floor machinists out of a total of 23 such employees laid off on January 19, 1938. This action was admittedly proper since he was junior to all the men in the group except one who was not rehired on March 15, 1938. On that date only one of the 9 was taken back. Of the remaining 8, 7 were senior to Casto. Nevertheless the Board held that he was refused reinstatement on account of his union activities. The Board points out that Casto was senior to a number of the "boys" who were rehired and contends that as he was a skilled workman, he was entitled to the preference. The obvious answer is that 7 other men in his group had equal skill and greater seniority. Casto was distinguishable from them if at all by his greater service to the union; but the statute forbids discrimination on this account either for or against a worker.

engage in concerted activities for the purpose of collective bargaining. National Labor Relations Board v. Skinner & Kennedy Stationery Co., 8 Cir., 113 F.2d 667, 668, 671; Eagle-Picher Mining & Smelting Co. v. National Labor Relations Board, 8 Cir., 119 F.2d 903, 911. In this instance the employer was under no legal compulsion to take the strikers back since they had violated the governing agreement; but when their breach was overlooked, and it was decided to reinstate them, they were entitled to even handed treatment, and the exclusion of any of them for reasons condemned by the statute would have been an unfair labor practice. National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345, 346, 58 S.Ct. 904, 82 L.Ed. 1381.

Carder was safeguarded by the same beneficent rule. Was there substantial evidence tending to show that an illegal purpose actuated his employer in refusing him reinstatement under the circumstances described? We think not. The employer had no need to discourage the men from engaging in such a strike. That had already been done by the union itself in its peremptory order condemning the strike and ordering the men back to work. If the company's purpose was to discourage strikes, that could more easily have been accomplished by refusing reemployment to the men who had broken their contract rather than by excluding the man who had merely assumed a hands off attitude. The undisputable fact is that there was a good reason for discriminating between Carder and the strikers that had no relation to union organization or collective bargaining. Carder's disloyalty in refusing to help his employer in an emergency in contrast with the willing assistance of his brother foremen of equal standing, was an all sufficient reason for his discharge. To cast this established fact aside and to hazard the conjecture that the employer was actuated by an unlawful motive, is merely to indulge in a speculation that furnishes no legal basis for the Board's order.

A decree will be issued directing the enforcement of the Board's order after modification to conform with this opinion.

## On Petition for Rehearing.

PER CURIAM.

A petition for rehearing complains of the action of the court with respect to that portion of the order relating to the reinstatement of Carder. It is said that, since Carder's refusal to work was because of the existence of a strike, that refusal cannot furnish the basis of a lawful discharge, even though the company may have felt that Carder was guilty of disloyal conduct in refusing to work and may have discharged him for that reason. The petition says: "The court appears to have announced the view that, under the Act, an employer may discharge or refuse to reinstate an employee who engages in a strike or participates in other concerted activities for purposes of collective bargaining, if, in the employer's view, the employee's activity in this regard constitutes a breach of a duty of loyalty owing to the employer under the circumstances of his employment, and if that purpose motivates the employer's conduct."

 It was not our intention to make such a holding. We think, however, that certain language in the last paragraph of the opinion discussing the discharge of Carder is too broad and may, on that account, be subject to misinterpretation, and that therefore the basis upon which the discharge of Carder was justified should be restated. The strike of the six operators was illegal and would have constituted sufficient justification for their discharge. National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 344, 59 S.Ct. 508, 83 L. Ed. 682. Carder's discharge was justified on this ground, for certainly if the discharge of operators who have struck illegally, is justified, the discharge of one who refuses to work because the strike is on is also justified. The operators were subsequently allowed to return to work after a conference between the company and the union officials; but there was nothing in the agreement that resulted in the reinstatement of the operators which required the reinstatement of Carder, and the company was under no obligation to reinstate him. National Labor Relations Board v. Sands Mfg. Co., supra. It is true that the company could not lawfully do anything in connection with the reinstatement of the strikers to discourage the right of collective bargaining guaranteed by the Act, National Labor Relations Board v. Mackay Radio Co., 304 U.S. 333, 346, 58 S.Ct. 904, 82 L.Ed. 1381; but in the pending case, there was clearly no unlawful discrimination after a lawful strike on account of union activity as there was in the Mackay case. In the pending case the strike was unlawful, the

men who were taken back were members of the union, while the employee refused reinstatement was not a union man. It cannot be that an employer is forbidden to discharge a foreman who aids an unlawful strike by refusing to obey the lawful orders of his master because the strike is in progress.

Petition for rehearing denied.