BUSCH & SONS, INC., A CORPORATION OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. RETAIL UNION OF NEW JERSEY, LOCAL 108—AFFILIATED WITH R. W. D. S. U.—C. I. O., MAX GREENBERG, IRVING ROSENBERG, LOUIS JACOBS, BERNARD G. HUGHES, PAUL HORN, WESLEY B. DAVIS (ALSO KNOWN AS WESLEY BRYANT), NICHOLAS PELURO AND LOUIS S. MOORE, DEFENDANTS-APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued September 9, 1953—Decided October 1, 1953.

Before Judges Eastwood, Jayne and Francis.

*Mr. Samuel Kaufman* argued the cause for the plaintiff-respondent (*Messrs. Bilder, Bilder & Kaufman,* attorneys; *Mr. John M. Kaufman,* on the brief).

*Mr. Samuel L. Rothbard* argued the cause for the defendants-appellants (*Messrs. Rothbard, Harris & Oxfeld,* attorneys).

The opinion of the court was delivered by
Francis, J. A. D.   The Chancery Division issued a blanket injunction restraining appellants, labor union and individ-

uals, from picketing respondent's place of business. This appeal followed.

Busch & Sons, Inc. is engaged in the retail jewelry business in interstate commerce. It operates three stores in New Jersey, the principal one at 875 Broad Street, Newark, and the other two at High Street and Springfield Avenue, Newark, and in Summit. Out-of-state stores are maintained in Alabama and Texas.

Early in April 1951 appellant Retail Union of New Jersey, Local 108, C. I. O., undertook organizational activities among Busch's employees. At this time there were 37 employees in all in the three stores, and according to appellant Irving Rosenberg, the director of organization of the union, 12 of them had signed applications for membership. Since the union maintained that only certain workers, 15 in number, were eligible for an appropriate bargaining unit, membership of the majority of these provided the basis for its demand to be considered the exclusive bargaining agent of all those in the unit.

On April 9, 1951 Rosenberg wrote to the employer claiming that "a majority of your New Jersey employees have joined our union and have authorized us to represent them in collective bargaining with you." The letter requested that the union be recognized as the exclusive bargaining agent of the employees and asked for a conference on the subject. In the afternoon of April 10 such a conference was held.

It appeared that on April 9 the employer had discharged two employees, giving economy as the reason. At the meeting the union claimed that these discharges were on account of union activities and not for the assigned ground.

During the discussion the union presented two demands, one, that these employees be reinstated, and the other, that it be accepted as the bargaining representative of the workers. The company denied that the discharges were for organizational activities. It suggested that an unfair labor practice complaint should be filed with the National Labor Relations Board and asserted that it would abide by the result reached

by the board. With respect to recognition as the collective bargaining agent, it maintained that a majority of the employees in the unit it deemed appropriate for bargaining had not joined the union and it proposed that an application be made to the same board for an election to decide the question. The proposals were rejected and an impasse was reached. On April 10, eight of the Newark employees went on strike and with other persons, including, for some time at least, the two discharged workers, began to picket the Broad Street store.

The picketing took on an unlawful character and an application for restraint was made. After hearing, the Chancery Division found it to be unlawful in that it consisted of:

"Mass picketing in front of, and in close proximity to the main entrance of plaintiff's said store and at the rear entrance of plaintiff's said store on William Street in such manner as to block, hinder and prevent persons attempting or desiring to enter or leave the plaintiff's store from entering or leaving said store; massing, crowding and collecting in such manner and in such numbers in front of the main entrance of complainant's said store on Broad and William Street as to intimidate persons having lawful business with plaintiff from entering plaintiff's store; obstructing and interfering with customers or prospective customers of plaintiff, desiring or attempting to enter or leave plaintiff's store, for the purpose of doing business with plaintiff at the said store."

As a consequence, on October 9, 1951 an injunction was issued restraining this conduct, limiting the number of pickets and regulating the manner of the picketing.

Additional conferences were held in an effort to adjust the problems. The company insisted that the discharges were for economy reasons and asserted that the two youngest employees in point of service were the ones separated from employment, even though they were more competent than some of the others. And it offered to reinstate them and allow the union to designate two others to be discharged in their place. The offer was refused. In addition, there was talk about having the New Jersey State Board of Mediation take charge of the entire matter, including an election, but this too was not fruitful. Here the record seems to indicate that

agreement could not be reached as to the appropriate bargaining unit, and further that the company wished to invoke the jurisdiction of the National Labor Relations Board for both election and any claim of unfair labor practice in connection with the discharges.

About November 15, 1951 the employer filed a petition with the National Labor Relations Board, seeking an election, and it sought to have the employees of all three New Jersey stores declared to be the appropriate bargaining unit for the purpose. This petition was dismissed. Then a second petition was filed asking for an election in a unit consisting of the employees of the Broad Street store.

It appears without dispute that before the second petition was filed the striking employees had been offered the opportunity to return to their employment and had refused to do so.

In any event, a hearing was held on the petition at which, according to the decision of the board on August 18, 1952, "the employer's president testified, without contradiction, that (a) all strikers had been offered reinstatement and warned that, if they did not return, they would be replaced; (b) that all strikers were, in fact, replaced by December 1951; (c) that all replacements were told, upon being hired or transferred, that they were permanent employees; and (d) that there are no vacancies in any of these jobs." The board then declared:

"Under these circumstances, we find that the replacements were hired as permanent employees, that they are eligible to vote, and that the strikers, whom they replaced, not being entitled to reinstatement, are not eligible to vote."

An election was then directed to be held in a bargaining unit consisting of all employees in the Broad Street store, including regular part-time employees, but excluding professional and confidential employees, watchmen, guards and supervisors, as defined in the National Labor Relations Act, "to determine whether or not they desire to be represented for purposes of collective bargaining by Local 108, Retail

Union of New Jersey, Retail, Wholesale & Department Store Union, C. I. O." And it declared further that the voting eligibles were the employees "who were employed during the payroll period immediately preceding the date of this Direction of Election, * * * but * * * excluding employees on strike who are not entitled to reinstatement."

When this determination was made, the union realized that it could not win such an election because none of the employees then in the store were among its members. As a result, it applied to the board to strike its name from the ballot and eliminate it as a party to the election on the ground that it "does not claim to represent the employees of the employer in the unit found to be appropriate by the National Labor Relations Board in said decision and direction of election * * *." The employer unsuccessfully resisted the motion, the board declaring that the "Union's motion is a clear abandonment of its claim to represent the employees of the employer and relieves the employer of any obligation to recognize it as the representative of such employees." Accordingly, the petition for election was dismissed.

Thereafter the union made no further efforts to organize the company's employees and abandoned its demand for a collective bargaining agreement. However, the picketing continued and on September 12, 1952 counsel for the union and for eight of the strikers and one of the discharged employees wrote to the company stating that "these employees desire to return to work for you and herewith offer to return to work for you at their former positions." The letter said further that counsel had been authorized by the union to "inform you that upon the reinstatement by you of these employees at their former positions with you, all picketing and other strike activities will immediately cease." The company made no answer and thereafter, according to the union, the only purpose of the picketing was to secure the requested reinstatement.

About the end of September 1952 a supplemental complaint was filed in the Chancery Division reciting the disposition of the matter by the National Labor Relations Board,

the only avowed present purpose of the picketing, that the purpose was unlawful because it sought the discharge of permanent employees, and praying for a blanket restraint against further picketing. After argument, the court found that the relation of employer and employee no longer existed between the parties and that there was no current labor dispute between them. Accordingly, it banned all picketing. The legal propriety of this injunction is the subject of the present appeal.

When respondent's eight employees went on strike, undoubtedly a labor dispute existed and picketing was proper. The dispute had two aspects: (1) the claim of the union for recognition as bargaining representative of the employees, and (2) the assertion that the discharges were the result of the union activities of the two employees and therefore constituted an unfair labor practice. However, so long as the employer acted honestly and in good faith, it was entitled to stand on the position that the discharges were actuated by business economy. Also, again assuming good faith, the law recognized the employer's right to withhold recognition until the union's claim to representation of a majority of the employees in an appropriate bargaining unit was established by a Labor Board conducted election. *N. L. R. B. v. Jackson Press*, 201 *F.* 2d 541 (*7 Cir.* 1953).

Instead of filing a complaint for an unfair labor practice or a petition for an election to determine the extent of its representation, a strike was called in an effort to gain thereby what could have been achieved by the board's processes, if justification existed therefor.

In any event, no complaint charging an unfair labor practice because of the discharges was ever presented or filed. On the contrary, after the company's petition for election was recorded, it is obvious that such charge, even if it was in fact ever considered a justifiable one, had been abandoned. On the argument of this appeal, the union conceded that under the board's practice, no election will be ordered while any claim of unfair labor practice is outstanding and undetermined. Consequently, if any such charge had been made

here, no hearing would have been held on the petition for election. The reason for this is obvious. If an employee has been the victim of a discriminatory discharge, and such a finding is made after hearing by the board, he is entitled to reinstatement and to vote at the election. *Anno.* 173 *A. L. R.* 1413, § 15. So those employees eligible to participate in the voting contest cannot be determined accurately until such complaints are disposed of.

In the present case, the union went to hearing on the election petition without any such objection. In fact the decision of the board recites the concession of the union that "the present strikers are governed by the principles applicable to economic strikers." This stipulation meant that whatever the asserted original cause of the strike and picketing, it was now deemed to be solely an economic one seeking to establish the right to be considered the exclusive bargaining representative of the employees.

The concession brought into operation the provision of section 9(c) (3) of the Labor-Management Relations Act of 1947 which says that:

"Employees on strike who are not entitled to reinstatement, shall not be eligible to vote." 29 *U. S. C. A.*, § 159(c) (3).

In an economic strike, such as that designed to secure union recognition, as the board said here, "it has long been established that economic strikers who have been permanently replaced are not entitled to reinstatement."

The leading case which established this doctrine is *N. L. R. B. v. Mackay Radio & Telegraph Co.*, 304 *U. S.* 333, 344, 345, 346, 58 *S. Ct.* 904, 910, 82 *L. Ed.* 1381 (1938). There the United States Supreme Court said:

"There is no evidence and no finding that the respondent was guilty of any unfair labor practice in connection with the negotiations in New York. On the contrary, it affirmatively appears that the respondent was negotiating with the authorized representatives of the union. Nor was it an unfair labor practice to replace the striking employees with others in an effort to carry on the business. Although section 13 (of the original National Labor Relations Act)

provides, 'Nothing in this Act shall be construed so as to interfere with or impede or diminish in any way the right to strike,' it does not follow that an employer, guilty of no act denounced by the statute, has lost the right to protect and continue his business by supplying places left vacant by strikers. And he is not bound to discharge those hired to fill the places of strikers, upon the election of the latter to resume their employment, in order to create places for them. The assurance by respondent to those who accepted employment during the strike that if they so desired their places might be permanent was not an unfair labor practice, nor was it such to reinstate only so many of the strikers as there were vacant places to be filled." (Parenthetical insertion ours.)

While this rule has been criticized as opposed to present-day concepts of sound industrial labor relations (1 *Teller, Labor Disputes and Collective Bargaining, p.* 240, § 79), no noticeable disposition to change it appears in the reports. *N. L. R. B. v. Jackson Press, supra; Textile Workers Union ·of America v. Arista Mills Co.,* 193 *F.* 2d 529 (4 *Cir.* 1951). In fact, the conclusion is inescapable that Congressional awareness of the legal status of economic strikers who had been replaced, brought about section 9(*c*) (3) of the Taft-Hartley or Labor-Management Relations Act.

In the quest for peace in labor relations and the lessening of disruption of interstate commerce by strikes, section 9(*c*) (3), which legislates away the right of replaced economic strikers to vote in an election to decide upon a bargaining representative, undoubtedly sprang from an effort to persuade employees in representation cases to seek an election through the facilities of the Labor Board before striking. (See Senate Labor Committee Report quoted in *Anno.* 173 *A. L. R.* 1413, § 15). Appellant sharply criticizes the provision but the courts have nothing to do with problems of wisdom or equity or of policy of statutes; such matters are entirely within the legislative domain.

From all that has been said, it is apparent that after the strikers had been replaced and after the decision of the Labor Board, they had no right to reinstatement, and there being no vacancies, the employer was under no duty to discharge permanent employees in order to provide employment for them. Thus the pivotal question here is brought into

sharp focus: Was the continued picketing to obtain reinstatement enjoinable?

At this late date in our industrial life, the right of employees to engage in picketing in the course of a labor dispute cannot be questioned. However, a qualification on the right is equally settled, namely, that the picketing must be in furtherance of or to accomplish a lawful labor objective. *Isolantite, Inc., v. United Electrical, etc., Workers*, 130 *N. J. Eq.* 506 (*Ch.* 1941), reversed on other grounds, 132 *N. J. Eq.* 613 (*E. & A.* 1942); *McPherson Hotel Co. v. Smith*, 127 *N. J. Eq.* 167 (*Ch.* 1940); *Eastwood-Nealley Corp. v. International Ass'n. of Machinists*, 124 *N. J. Eq.* 274 (*Ch.* 1938); *Wasilewski v. Bakers Union, Local No.* 64, 118 *N. J. Eq.* 349 (*Ch.* 1935); *Bayonne Textile Corp. v. American, etc., Silk Workers*, 116 *N. J. Eq.* 146, 163 (*E. & A.* 1934); *C. B. Rutan Co. v. Local Union No. 4, Hatters' Union of America*, 97 *N. J. Eq.* 77 (*Ch.* 1925); *International Brotherhood of Teamsters, etc., v. Hanke*, 339 *U. S.* 470, 70 *S. Ct.* 773, 94 *L. Ed.* 995 (1950); *Building Service Employees International Union v. Gazzam*, 339 *U. S.* 532, 539, 70 *S. Ct.* 784, 94 *L. Ed.* 1045 (1950); *Hughes v. Superior Court of California*, 339 *U. S.* 460, 466, 70 *S. Ct.* 718, 94 *L. Ed.* 985 (1950); *Saveall v. Demers*, 322 *Mass.* 70, 76 *N. E. 2d* 12, 2 *A. L. R. 2d* 1190 (*Sup. Jud. Ct.* 1947); *Retail Clerks' Union, Local No.* 1403 *v. Wisconsin Employment Relations Board*, 242 *Wis.* 21, 6 *N. W. 2d* 698, 149 *A. L. R.* 452 (*Sup. Ct.* 1942); *Restatement of the Law, Torts,* § 794; *Anno.* 174 *A. L. R.* 594. Unlawful picketing is not saved from restraint by the Anti-Injunction Act (*N. J. S. 2A*:15–51 *et seq.*). Such picketing removes the controversy from the shielded category of a labor dispute. *Cordey China Co. v. United Mine Workers*, 25 *N. J. Super.* 514 (*Ch. Div.* 1953); *Isolantite, Inc. v. United Electrical, Radio, etc., Workers, supra; Eastwood-Nealley Corp. v. International Ass'n of Machinists, supra.*

In the present situation, at the time of injunction the picketing was in furtherance of a non-existent right, and there being no vacancies in the employer's service, neces-

sarily it sought to compel the discharge of permanent employees whose rights were protected by the Labor-Management Act. The discharge of these permanent employees would constitute an act of discrimination in favor of the union members who had abandoned the claim for union recognition, and against employees who had indicated by affidavit that they did not wish to join the union. In doing so the employer would be guilty of an unfair labor practice in violation of the Labor-Management Relations Act (29 U. S. C. §§ 157 and 158(a) (1) and (3). Likewise, the act of the union in procuring the discharge would be an unfair labor practice contrary to the same act, §§ 157 and 158(b) (1) and (4).

Plainly, therefore, the purpose sought to be obtained by appellants' picketing was unlawful. As the *Restatement* puts it:

"An act by an employer which would be a crime or a violation of a legislative enactment or contrary to defined public policy is not a proper object of concerted action against him by workers." (*Torts*, § 794.)

Specific declarations that picketing for the purpose of putting pressure upon an employer to commit an unfair labor practice in violation of the federal or a state labor relations act is subject to injunction, may be found in the *Isolantite, Inc., Eastwood-Nealley Corp.* and *Cordey China Co.* cases, *supra*, and in *Florsheim Shoe Store Co. v. Retail Shoe Salesmen's Union*, 288 N. Y. 188, 42 N. E. 2d 480 (*Ct. App.* 1942); *Fred Wolferman, Inc., v. Root*, 356 Mo. 976, 204 S. W. 2d 733, 174 A. L. R. 585 (*Sup. Ct.* 1947); *Retail Clerks' Union, Local No.* 1403 *v. Wisconsin Employment Relations Board, supra*.

Appellant argues that picketing is an exercise of the right of free speech guaranteed by the Fourteenth Amendment of the Federal Constitution. It is true that picketing has been identified with free speech (*Thornhill v. Alabama*, 310 U. S. 88, 60 S. Ct. 736, 84 L. Ed. 1093 (1940); *Carlson v. California*, 310 U. S. 106, 60 S. Ct. 746, 84 L. Ed. 1104 (1940)).

But the Supreme Court has recognized that it is a means of economic coercion also and not simply a vehicle for expressing ideas or disseminating the facts of a labor dispute. As the court said in *Hughes v. Superior Court of California, supra*:

" 'The domain of liberty, withdrawn by the Fourteenth Amendment from encroachment by the states,' * * * no doubt includes liberty of thought and appropriate means for expressing it. But while picketing is a mode of communication, it is inseparably something more and different. Industrial picketing 'is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated.' " (339 *U. S.* at *page* 464, 70 *S. Ct.* at *page* 721).

▆ Moreover the court has recognized the qualified nature of the right of free speech and has sanctioned the removal of picketing from the protective borders of the Constitution when it is pursued in an unlawful manner or where the objective thereof is unlawful. *Building Service Employees International Union v. Gazzam*, 339 *U. S.* 532, 70 *S. Ct.* 784, 94 *L. Ed.* 1045 (1950) ; *International Brotherhood of Teamsters, etc., Union v. Hanke, supra; Giboney v. Empire Storage Co.*, 336 *U. S.* 490, 69 *S. Ct.* 684, 93 *L. Ed.* 834 (1949) ; *Allen-Bradley, Local No. 1111 v. Wisconsin Employment Relations Board*, 315 *U. S.* 740, 62 *S. Ct.* 820, 86 *L. Ed.* 1154 (1941). And the power of the state courts to enjoin unlawful picketing which amounts to an abuse of the right to engage in it, remains undisturbed. In the *Hughes* case, the court said that:

"Picketing is not beyond the control of a State if the manner in which picketing is conducted or the purpose which it seeks to effectuate gives ground for its disallowance."

Since the picketing here was for an unlawful objective, the injunction properly issued. Accordingly, the judgment is affirmed.