34 N.J. Super. 13 (1955)
111 A.2d 415
BROWNING KING CO. OF NEW YORK, INC., A CORPORATION, PLAINTIFF-RESPONDENT,
v.
LOCAL 195, JOURNEYMEN TAILORS' UNION OF THE AMALGAMATED CLOTHING WORKERS OF AMERICA, C.I.O., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 29, 1954.
Decided January 21, 1955.
*17 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Joseph A. Hayden argued the cause for the respondent (Messrs. Clancy and Hayden, attorneys).
Mr. Sidney Reitman argued the cause for the appellant (Messrs. Kapelsohn, Lerner, Leuchter & Reitman, attorneys).
The opinion of the court was delivered by FRANCIS, J.A.D.
The Chancery Division enjoined peaceful picketing of the plaintiff's premises by the defendant union and all persons associated with it. The basic ground of the restraint was that the picketing was in pursuit of an unlawful objective.
The Browning King Co. of New York, Inc. is engaged in the retail men's clothing and haberdashery business. It maintains and operates one shop on Broad and Clinton Streets in Newark, N.J., and three others in New York City. Its main office and principal place of business is located at 241 Broadway, New York, N.Y.
The company employed at the Newark store a number of persons who were known as bushelmen. Such employees engage in the task of making alterations on clothes sold there. On November 1, 1950 a collective bargaining agreement was entered into on their behalf between the company and the United Garment Workers of America, Local 287, of the American Federation of Labor. The contract regulated their wages, hours of work and other conditions of employment. Its term was for one year but it was to continue in force from year to year unless previously terminated by either party upon written notice of 30 days to the other.
*18 About a month before the November 1, 1953 termination date, Local 287 gave notice that the contract would not be renewed on the existing basis and that negotiation of a revised one was desired. Thereafter and during the month of October, conferences were had between the employer's representative and the union, which, so far as the record shows, concerned themselves largely with the problem of a wage increase.
The busheling work for all three of the New York shops was done at a central plant operated in that city. The employees there were represented by the New York Joint Board, Amalgamated Clothing Workers of America, C.I.O., and that union was likewise engaged in negotiating a contract with Browning King during this same period.
The employer offered Local 287 the same wage scale as had been agreed upon tentatively by the C.I.O. in New York. The offer was refused and a counter-proposal made which was said to represent the prevailing wage scale in the New Jersey area. At the last conference, which took place on October 27, the offer was increased $1 per week and the employer announced that if it was not accepted, the busheling department of the Newark store would be transferred to its control plant in New York and the work done there by the C.I.O. union. The union representatives agreed to submit the matter to the employees and suggested that if agreement was not reached, the company might have to deal with the defendant, Local 195, Journeymen Tailors' Union of the Amalgamated Clothing Workers of America, C.I.O., which apparently had contracts covering alteration department employees in other comparable stores in the Newark area. The officer of the employer who was handling the transaction replied that he would not negotiate with that local; he was satisfied with the A.F. of L. if the employees accepted his terms.
The bushelmen rejected the offer; they went on strike on November 2 and began picketing the Newark store. On the same day the employer transferred the busheling operation *19 to the central plant in New York where it has been handled ever since, with the possible exception of occasions when that plant was overloaded. In that situation the work seems to have been taken care of at some unnamed place in Linden, N.J.
While the picketing was in progress, a meeting was arranged between Local 287, A.F. of L., and the defendant union. It took place on November 6, at which time all of the strikers signed membership cards and joined the defendant.
Thereafter defendant notified the company that it represented the strikers and wished to negotiate an agreement in their behalf. Also, on November 13 Local 287 advised the company that its services as bargaining agent had ceased and that defendant now occupied that status.
Picketing was halted by defendant in an effort to accomplish an agreement, but although some meetings were held between the parties, the company steadfastly refused to negotiate, saying that it had neither dispute nor relationship of any kind with defendant, and further that the strikers were no longer employees because the department having been abolished, the relationship of employer and employee had ceased to exist.
The testimony indicates that during the hiatus in the picketing the defendant protested against the allocation of the Newark alteration work to the New York C.I.O. local. The company sought arbitration of the dispute between the two unions and a hearing was ordered thereon for December 9 by the Impartial Chairman of the Clothing Association. The record does not disclose whether the hearing was held, and if so what result was reached. However, the central plant in New York continued to do the work. And one of the union witnesses testified that in the course of the discussions the employer's vice-president asserted that if the A.F. of L. local accepted the wage proposal the work would be done in Newark, but he would not negotiate with the defendant C.I.O. local.
*20 On December 4 picketing was resumed and shortly thereafter the action was instituted seeking the injunction.
The pleadings, arguments, oral opinion and memorandum of the trial court and the briefs presented to us show it to be undisputed that when the action was instituted and tried, the employer was subject to the federal Labor Management Relations Act of 1947 (29 U.S.C.A. § 141 et seq.). The absence of dispute on the subject was clearly based upon the understanding of the parties that tested by the then existing standards relating to the extent of an employer's engagement in interstate commerce necessary to make the jurisdiction of the National Labor Relations Board applicable, Browning King Co. qualified as such an employer. Under those standards the board accepted jurisdiction over an enterprise having (1) a direct inflow of materials from out of state valued at $500,000 per year, or (2) an indirect flow of materials from out of state valued at $1,000,000, or (3) $25,000 of interstate sales yearly, or (4) a combination interstate movement of goods where the percentage of minimum amounts bought or sold interstate, directly or indirectly, added up to 100%. The proof shows that gross sales of the Newark store alone for the 11-month period ending November 30, 1953 totaled $667,274.57.
The case was presented and tried and was argued on this appeal on the theory that the picketing was for an unlawful purpose, a purpose neither within nor protected by the federal act, and consequently cognizable by the state court and subject to its injunctive power.
The complaint was filed shortly after the opinion of the Appellate Division in Busch & Sons, Inc., v. Retail Union of N.J., Local 108, 27 N.J. Super. 432 (Oct. 1, 1953). At that time the precedents in New Jersey demonstrated generally that where the dispute between the employer and striking employees concerned a matter which is covered by the Labor Management Relations Act, if the object of picketing is to induce a violation of the act, the controversy is not *21 within the field of the federal preemption and the state court can issue its injunctive process. 27 N.J. Super., at page 441.
The Busch case was certified by the Supreme Court and pending the review the United States Supreme Court decided Garner v. Teamsters, C. & H. Union, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (Dec. 14, 1953). The principle stated there was that where the dispute concerns a subject matter which is regulated by or within the scope of federal legislation, the state courts are excluded from jurisdiction. More particularly, the court held that where picketing was through non-employees and for the purpose of coercing the employer into influencing the employees to join the union in violation of the Labor Management Relations Act, the state court had no jurisdiction because a complaint could be filed with the National Labor Relations Board.
The object of the picketing in the Busch case was to procure the discriminatory discharge of certain employees. This was declared to be unlawful as in violation of the Labor Management Relations Act and the Appellate Division affirmed the issuance of the injunction. However, our Supreme Court reversed, following the Garner case, saying that the basic issue between the parties was within the coverage of the federal act and consequently the determination thereof was exclusively for the National Labor Relations Board. Busch & Sons, Inc., v. Retail Union of N.J., Local 108, 15 N.J. 226 (1954).
It may be noted that in the present case the injunction was granted a week before the Busch reversal. Thereafter, on reargument applied for by the union, the trial court adhered to his original judgment that the picketing was not in furtherance of any lawful labor objective nor could it be justified on the thesis that the transfer of the busheling operation to New York created a recognizable labor dispute.
Thus we are brought to a consideration of the validity of the injunction in the light of the present state of the law.
No one questions that the controversy arose out of the negotiations between the company and Local 287, A.F. of L., *22 over the demand on behalf of the bushelmen for a wage increase. Manifestly, when these employees refused the wage increase offer of October 27 and struck on November 2, their sequential picketing was pursuant to a "labor dispute" within the contemplation of the New Jersey anti-injunction statute (N.J.S. 2A:15-58; R.R. 4:67-9). The contest concerned "terms or conditions of employment."
But the employer contends that immediately upon its putting into effect the threat to transfer the work to New York, the labor dispute terminated and the relationship of employer and employee ended between it and the strikers. The base upon which the argument rests is that a decision on the part of an employer to transfer a department or a portion of its operations to another of its places of business out of the area of work of the strikers, whether to avoid further negotiation respecting wages or for any other economic reason, is an exclusive prerogative of management. It is claimed that the right is an absolute one which may be exercised arbitrarily at any time, irrespective of the existence of a labor dispute concerning wages and even though the result is in effect a discharge of the workers. And specifically, by way of justification, the company says that the wage scale in New York is lower than the demand of the strikers and that the right to seek this economic advantage is settled in the law. Therefore the insistence is that upon the accomplishment of the change, no labor dispute existed and the picketing must be deemed to be designed to compel the restoration of the work to Newark  an unlawful objective, since management is under no duty to bargain collectively on the subject.
Ostensible support for the employer's position is found in Paul v. Mencher, 169 Misc. 657, 7 N.Y.S.2d 821 (Sup. Ct. 1937), affirmed 254 App. Div. 851, 6 N.Y.S.2d 379 (App. Div. 1938), leave to appeal denied, 279 N.Y. 813, 17 N.E.2d 684 (Ct. App. 1938), and reliance was placed thereon by the trial court.
*23 In that case the employer decided to discontinue his factory and the employees picketed to persuade him not to do so. The court said:
"There is no labor dispute as defined by statute between the parties hereto. It is the prerogative of any business man, with or without reason, to continue or discontinue in business, to change, alter or modify the nature of his business as he sees fit without necessity of explanation or excuse to anyone. When the plaintiff elected to discontinue his factory no one was privileged to complain even though it was done deliberately to avoid a labor dispute."
The decision to move a plant from one city or state to another, to discontinue a department, to transfer a particular operation from one plant to another, to abolish certain jobs, to contract out certain work formerly done in the plant, are incidents of management. Mt. Hope Finishing Co. v. National Labor Relations Board, 211 F.2d 365 (4th Cir. 1954); Huron Stevedoring Corp. v. Grogan, 127 N.Y.S.2d 99 (Sup. Ct. 1953); National Labor Relations Board v. National Die Casting Co., 207 F.2d 344 (7th Cir. 1953); National Labor Relations Board v. Grace Co., 184 F.2d 126 (8th Cir. 1950). However, in the present stage of development of industrial relations it cannot be said that there are no qualifications whatever on the use of such prerogatives.
In Teller, Management Functions Under Collective Bargaining (1947), 26, the subject is discussed. The author says:
"The few cases which do touch upon the effort of unions to encroach upon what are asserted to be the functions of management, appear to take an imperfect view of the subject. It is not entirely logical to attempt an arbitrary distinction between business rights and union rights. The former often affect the latter. And to this extent, the conflict can be posed from the point of view of an employment problem connected with management functions. The traditional legal approach is therefore bound to collapse as applied to specific cases.
The result may be distorted in either direction. The mere effect of a management decision upon employment may be held to legalize the use of concerted labor activity, when social and public interests may dictate the opposite result in a given case. And in other cases *24 emphasis may be placed upon the impact of union aims upon management rights, with a resulting decision in favor of management unjustified by overall considerations of public policy."
Likewise in Cox, Federalism in the Law of Labor Relations, 67 Harv. L. Rev. 1297, 1328, 1329 (1954), a similar view is expressed:
`The national labor policy is to encourage the negotiated adjustment of differences between labor and management. In practice the scope of management's exclusive functions is itself a common subject of bargaining, and there is nothing in the NLRA to suggest that the employees are not free to engage in concerted action on any issue in which they express a bona fide concern."
Under the Labor Management Relations Act, employees of a business subject thereto have the right to self-organization, to join unions and to bargain collectively through representatives of their own choosing and to engage in other concerted activities for the purpose of collective bargaining or mutual aid or protection. 29 U.S.C.A. § 157. And it is an unfair labor practice for either the employer or the union to refuse to bargain collectively in good faith with respect to wages and other conditions of employment in sincere effort to reach an agreement. 29 U.S.C.A. § 158(a)(1), (5); (b)(3); (d).
Frequently, it has been declared that where an employer undertakes a management function of the type already spoken of, not in good faith but to avoid obligations imposed by the act  of which the duty to bargain collectively with respect to wages is one  he is guilty of an unfair labor practice. Thus, the removal of a plant from one city to another to avoid dealing with the union (In re Jacob H. Klotz, 13 N.L.R.B. 746 (1939); In re Schieber Millinery Co., 26 N.L.R.B. 937 (1940), affirmed and enforced National Labor Relations Board v. Schieber, 116 F.2d 281 (8th Cir. 1940); In re Gerity Whitaker Company, 33 N.L.R.B. 393 (1941), affirmed and enforced National Labor Relations Board v. Gerity Whitaker Co., 137 F.2d 198 (6th Cir. *25 1942)); the abolition of a department or a portion of the business for the same reason (In re Bank of America National Trust & Savings Assn., 26 N.L.R.B. 198 (1940), enforced National Labor Relations Board v. Bank of America Nat. T. & Sav. Ass'n, 130 F.2d 624 (9th Cir. 1942); In re Newton Chevrolet, Inc., 37 N.L.R.B. 334 (1941)); the engaging of an alleged independent contractor to perform certain work to thwart union organization of the employees who had been doing it (In re Butler Brothers, 41 N.L.R.B. 843 (1942), affirmed and enforced, Butler Bros. v. N.L.R.B., 134 F.2d 981 (7th Cir. 1943); In re Gluek Brewing Co., 47 N.L.R.B. 1079 (1943), affirmed and enforced, National Labor Relations Board v. Gluek Brewing Co., 144 F.2d 847 (8th Cir. 1944)), were held to be unfair labor practices. Also, an employer which changed its delivery system by engaging an independent contractor and discharging its own employees, in order to frustrate the employees' right of self-organization, and which further refused to bargain as to the proposed business changes, violated the act (In re The Houston Chronicle Publishing Co., 101 N.L.R.B. 1208 (1952), enforcement denied National Labor Relations Board v. Houston Chronicle Pub. Co., 211 F.2d 848 (5th Cir. 1954); In re Rome Products Co., 77 N.L.R.B. 1217 (1948)), as well as one which closed a branch clerical office and shifted such work to the home office to avoid unionization of the clerical help (In re Tennessee-Carolina Transportation Co., 108 N.L.R.B. No. 179, 34 L.R.R.M. 1209 (1954)).
In fact, even where the board found that the closing of a factory in one city and the removal of the activity carried on there to another plant of the employer in a different city was not improperly motivated, it declared that:
"* * * The good faith discharge of the Brown Company's obligation * * * required the former, at least, to advise the union of the contemplated move and to give the union the opportunity to bargain with respect to the contemplated move as it affected the employees, such as the placement of the Charlotte employees *26 in positions at Monroe." In re Brown Truck & Trailer Mfg. Co., 106 N.L.R.B. No. 158, 32 L.R.R.M. 1580 (1953).
And see In re Bickford Shoes, 109 N.L.R.B. No. 188, 34 L.R.R.M. 1570 (1954).
In the plant removal cases the board gave the employer the election of returning its operations to their original location and reinstating the original employees, or reinstating them at the new location and paying the reasonable expenses in the transportation and moving of such employees to that place (In re Schieber Millinery Co., supra), or it ordered reinstatement and payment of transportation expenses for the employees and their families to the new location (In re Jacob H. Klotz, supra). In the other situations described, various remedial orders were entered, some including a direction for back pay.
On the other hand, an employer who in good faith transferred his plant to a new location where labor costs were cheaper after warning the union that its wages were too high to allow profitable operation, discharged his obligation to bargain about the change. In re Brown-McLaren Manufacturing Co., 34 N.L.R.B. 984 (1941); In re Bickford Shoes, Inc., supra.
Our purpose in referring to these decisions should be mentioned. The union claims that when the employer during the course of negotiations for a wage increase announced an intention to shift the busheling work to New York, if agreement was not reached on the basis of its offer, a duty existed both before and after the strike began to continue bargaining collectively in good faith on the subject of wages and the incidental factor of transfer of the operation.
There is no doubt that ordinarily strikers do not lose their status as employees during the strike. N.L.R.B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938); N.L.R.B. v. Greensboro Coca Cola B. Co., 180 F.2d 840 (4th Cir. 1950); Jefferey-DeWitt Insulator Co. v. N.L.R.B., 91 F.2d 134 (4th Cir. 1937), certiorari denied 302 U.S. 731, 58 S.Ct. 55, 82 L.Ed. 565 *27 (1937); Textile Workers Union of America v. Paris Fabric Mills, Inc., 22 N.J. Super. 381 (App. Div. 1952); Fryns v. Fair Lawn Fur Dressing Co., 114 N.J. Eq. 462 (Ch. 1933). The duty to bargain continues while the strike is in progress (N.L.R.B. v. Deena Artware, Inc., 198 F.2d 645 (6th Cir. 1952), certiorari denied 345 U.S. 906, 73 S.Ct. 644, 97 L.Ed. 1342 (1953)), and the employer is not relieved thereof because pre-strike negotiations resulted in an impasse. N.L.R.B. v. United States Cold Storage Corp., 203 F.2d 924 (5th Cir. 1953), certiorari denied 346 U.S. 818, 74 S.Ct. 30, 98 L.Ed. 344 (1953). In the present case, the possibility continued that the union and the employer might compromise their substantive demands and reach agreement upon wages and the retention of the busheling in Newark.
So the cases dealing with management functions are cited to demonstrate that precedents are available in support of the defendant's assertion that situations like the present one are within the scope of the statutory duty to bargain collectively and in good faith with respect thereto.
It is neither our function nor our privilege to decide whether the duty to bargain collectively exists in the factual setting of this case. Our function is limited to the decision now made by us that a colorable claim exists for the assertion that the controversy between the parties is within the coverage of the federal act. The employer concededly being in interstate commerce, the ultimate problem is exclusively for the National Labor Relations Board to determine. In this state of affairs "our courts must acknowledge the Board's primacy to deal with it." Busch & Sons, Inc., v. Retail Union of N.J., Local 108, supra, 15 N.J., at page 235. Nor can we decide that the employer did or did not bargain in good faith either with respect to the wage demand or the transfer to New York. By the same reasoning, that too is within the sole province of the board.
Other aspects of this controversy are likewise for determination in the federal domain. Was the transfer of the work upon the happening of the strike, in association with the *28 statement that the strikers' employment was terminated by the removal, and the refusal to bargain further with the defendant as their representative, an interference with the right guaranteed the employees under section 7 of the act to join a labor organization and to bargain collectively through representatives of their own choosing (29 U.S.C.A. § 157)? Was the employer's act a discriminatory lockout? Cf. Diaper Jean Mfg. Co., 109 N.L.R.B. No. 152, 34 L.R.R.M. 1504 (1954). When the American Federation of Labor, Local 287, withdrew as their agent, were the strikers deprived of their right to join another union during the period of the strike? When the employer, in spite of knowledge that all of the strikers had joined the defendant union, refused to deal with it at all, was there a violation of section 7? And finally, was one of the purposes of the strikers in continuing the picketing that of requiring the employer to assign the alteration work to them rather than to the New York union, and if so was it a transgression of section 8(b)(4)(D), (29 U.S.C.A. § 158(b)(4)(D))?
The application of the Garner and Busch doctrine of federal supremacy and preemption to our factual issue is questioned. In the Garner case the facts demonstrated that the employees were engaging in conduct violative of the federal act; in the Busch case there was at least a colorable issue as to violation thereof. As a consequence the pronouncement was made that it was open to the employer to invoke the preventive jurisdiction of the National Labor Relations Board by filing a complaint. Here the employer in effect says: "We are simply endeavoring to effectuate a management decision to transfer our busheling operation. Our employees or former employees are picketing to prevent the accomplishment of that purpose or to influence or coerce us into its abandonment." Predicated upon this assertion, the claim is made that picketing in connection with this dispute is illegal, but since the subject matter of the dispute does not involve an unfair labor practice governed by the act, no complaint can be filed by the employer. Therefore *29 it is argued that if the aid of the state court cannot be invoked, no remedy exists.
Obviously a demand on an interstate commerce employer for a wage increase is a matter for collective bargaining. If the negotiations result in an impasse or if there is a failure to bargain in good faith and a strike occurs, peaceful picketing cannot be subjected to the injunctive jurisdiction of the state courts. Congress has expressly recognized the right to strike in such a situation, and as the United States Supreme Court said in International Union of United Auto, Aircraft and Agr. Implement Workers of America, C.I.O., v. O'Brien, 339 U.S. 454, 70 S.Ct. 781, 94 L.Ed. 978 (1950), concurrent state regulation of peaceful strikes for higher wages is not permitted. "Congress [has] occupied this field and closed it to state regulation." (339 U.S., at page 457, 70 S.Ct., at page 783). Is it not for the board to determine if there is present here basically a peaceful strike for higher wages?
Further, the employer's argument overlooks the doctrine of the federal cases that in certain factual contexts, such as when it is an incident of a wage dispute or part of a plan to avoid unionization or to eliminate a union from a plant, discussion in good faith about a proposed transfer of an operation is an integral part of the collective bargaining process. Where the doctrine applies, failure to negotiate about it may constitute an unfair labor practice by the employer and proper cause for a board complaint.
Moreover, a further refinement of the problem would be open for the board's consideration, namely, whether regardless of the transfer the refusal to negotiate with the defendant union thereafter during the progress of the strike, looking toward a settlement of the dispute as to wages by compromise or even acceptance of the employer's terms, constituted a proscribed practice.
At a hearing on such a complaint or complaints a determination that bargaining with respect to the shift of the busheling operation was required under the circumstances and *30 not engaged in in good faith, or that it was unlawful not to bargain with defendant union thereafter about the wage problem, would be conclusive of the present issue.
Allusion is made to the fact that neither the employer nor the union has filed or shown any disposition to file a complaint with the Labor Board. Neither this, nor the possibility that one or the other or even both of the parties may be found guiltless in such a proceeding, has the effect of conferring jurisdiction on the state court. If the necessary interstate commerce activities of the employer are present, the crucial inquiry is whether the conduct or practices of the parties are within the protective ambit of the act. If they are, and the objection to the jurisdiction is properly made and not dilatory or frivolous, the only tribunal with lawful competence to consider the matter is the Labor Board. Busch & Sons, Inc., v. Retail Union of N.J., Local 108, supra, 15 N.J., at page 235.
Since it cannot be said that the assertion of federal preemption is sham or that there is no substance to the argument that the issues between the parties are properly matters for collective bargaining, the board jurisdiction in the first instance is supreme and concurrent state regulation does not exist. This is not a case which is either governable by the State or entirely ungoverned; it is not a case involving an attempt to accomplish a union objective by the use of illegal or coercive methods which are not specifically designated as unfair labor practices by the national law. International Union, U.A.W., A.F. of L., Local 232, v. Wisconsin Employment Relations Board, 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651 (1949); Allen-Bradley Local No. 1111, United Electrical, Radio and Machine Workers of America v. Wisconsin Employment Relations Board, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154 (1942).
The suggestion has been made that if the union does not file a complaint charging unfair labor practices, but simply continues picketing, and if the company cannot do so (which, of course, is for the board to determine on the facts presented), *31 then an adjudication cannot be obtained of the problem as put by it, namely, that the strike and picketing amount to an unlawful invasion of an absolute management prerogative. However, this is a matter over which the state courts have no control. Federal regulation, representing the Congressional will, having intervened, concurrent state authority is absent.
There is no showing here that the Labor Board would decline or has declined to exercise its power to deal with this controversy if its jurisdiction were invoked. Busch & Sons, Inc., v. Retail Union of N.J., Local 108, supra, 15 N.J., at page 233. Much is being written currently as to whether the federal regulation has preempted the field in all labor relations matters covered by the act so that the state courts cannot adjudicate therein even though the Labor Board promulgates certain self-imposed restrictions on the exercise of its established jurisdiction. Universal Car Co. v. Assn. of Machinists, 35 L.R.R.M. 2087 (Mich. Circ. Ct. Nov. 1954); The Supreme Court, 1953 Term, 68 Harv. L. Rev. 96, 143 (Nov. 1954); Roumell and Schlesinger, The Preemption Dilemma in Labor Relations, 18 Univ. of Detroit L.J. 17 (Nov. 1954); Federal Preemption of Peaceful Stranger Picketing, 54 Col. L. Rev. 997 (June 1954); Cox, Federalism in the Law of Labor Relations, supra, 67 Harv. L. Rev. 1297 (June 1954); Rose, Garner v. Teamsters: The Supreme Court and Private Rights, 40 Va. L. Rev. 177 (Feb. 1954).
After the injunction was granted against the union here and pending the appeal, the Labor Board adopted new standards by which it would regulate its assumption of jurisdiction. With respect to retail stores, a certain volume of yearly business in certain aspects of interstate commerce was set out as the criterion. The volume is greater than that which made an employer subject to the act when this suit was instituted and decided.
Appellant now argues that judged by these standards the board would not take jurisdiction of this case. The difficulty with the suggestion is that the proof in the case as to the *32 volume of business, particularly that portion of it which enters the stream of commerce, does not demonstrate that by the application of either the single store or chain test the company's labor relations problems, such as we have here, would not be accepted for determination. Even if we were to apply the new standards retroactively, the burden rests upon the company to demonstrate that its interstate sales or flow of goods do not meet the new criterion. That burden cannot be supported on the record before us.
Accordingly, it must be concluded that the Chancery Division was without authority to enjoin the picketing.
Although the decision has been reached that jurisdiction over the subject matter does not exist, it seems advisable to express our view of the propriety of the injunction in relation to the law of New Jersey.
The trial court concluded that the injunction should issue because no controversy existed between the parties which could be classed as a labor dispute and therefore free from such restraint under the anti-injunction statute. N.J.S. 2A:15-58.
We have already indicated our view that the strike emanated from an effort to obtain higher wages. This controversy was the producing cause and it constituted a labor dispute which was within the protective confines of the legislation referred to.
The removal of the alteration work to New York while the strike was in progress did not transform the picketing into an unlawful activity nor did it terminate the then existing employment status, namely, that of striking employees. The transfer was an incident of the dispute, a bargaining lever in the hands of the employer, but not an effective unilateral means of putting an immediate end to the controversy and the right to picket.
The effort of the union to negotiate for the retention in or the return of the work to Newark as part of the bargaining process for an increase in wages, does not make the strike and picketing unlawful because it incidentally seeks to influence *33 a management function. Cf. Restful Slipper Co. v. United Shoe & Leather Union, 116 N.J. Eq. 521 (Ch. 1934); C.B. Rutan Co. v. Local Union, No. 4, Hatters Union of America, 97 N.J. Eq. 77 (Ch. 1925).
The intrusion of the defendant union into the negotiations was not the act of a stranger or an intermeddler even though it had no contractual connection with the company. All of the strikers had become its members before it undertook to appear for them; and there can be no legal objection to the attempt of their authorized representative to act in the furtherance of their interests. The dispute of the strikers-picketers certainly was founded upon and grew proximately out of the basic relationship of employer and employee. Outdoor Sports Corp. v. A.F. of L., Local 23132, 6 N.J. 217, 227 (1951).
The judgment is reversed for lack of jurisdiction in the Chancery Division over the subject matter, and also because a labor dispute existed between the parties and the issuance of an injunction against peaceful picketing was banned by the anti-injunction act.